## Commonwealth *vs.* Eric Murray.

Middlesex. September 9, 2011. - November 22, 2011.

Present: Ireland, C.J., Spina, Cordy, Duffly, & Lenk, JJ.

*Practice, Criminal,* New trial, Disclosure of evidence. *Evidence,* Disclosure of evidence, Exculpatory, Impeachment of credibility, Bias, Contradiction of witness, Motive. *Witness,* Impeachment, Bias.

A Superior Court judge did not abuse her discretion in granting a criminal defendant's motion for a new trial on the basis of the Commonwealth's failure to disclose exculpatory evidence, i.e., information contained in an affidavit of a police officer detailing the gang activities of a group whose members included a homicide victim and several eyewitnesses, where the evidence before the judge supported her findings that the withheld evidence was subject to the Commonwealth's control such that the Commonwealth had a duty to disclose it; was potentially exculpatory, in that the defendant could have used it to support his theory of manslaughter based on the use of excessive self-defense, or to impeach witnesses by contradiction and bias; and was prejudicial, in that it gave rise to a substantial risk that the jury would have reached a different conclusion if they had heard the evidence concerning the group. [19-23]

Indictments found and returned in the Superior Court Department on October 30, 2003.

A motion for a new trial, filed on January 29, 2008, and a motion for reconsideration, filed on May 10, 2010, were heard by *Sandra L. Hamlin,* J.

*Robert J. Bender,* Assistant District Attorney, for the Commonwealth.

*Ruth Greenberg* for the defendant.

Cordy, J. After his conviction in 2005 of murder in the first degree and carrying a firearm without a license, and while his appeal to this court was pending, the defendant filed a motion for a new trial and a motion for postconviction discovery relating to evidence not disclosed by the Commonwealth. We remanded the motions to the Superior Court. After separate hearings on the motions, the trial judge granted the defendant's motion for a new

trial. The Commonwealth has now appealed. We affirm the judge's order granting the defendant a new trial.

1. *Background.* The undisclosed evidence consisted of information known to the police regarding the gang activities of a group called the "KST" (Kendall Street Thugs or Team), whose members included the victim and several eyewitnesses to the homicide. This information had been summarized in an affidavit of Lieutenant Kevin Slattery of the Framingham police department. Slattery prepared the affidavit in June, 2007, more than two years after the defendant's trial, when law enforcement authorities arrested twenty individuals associated with the KST on Federal and State drug charges. The affidavit was filed in the United States District Court for the District of Massachusetts in support of the government's motion for pretrial detention of the KST defendants. Slattery detailed the gang activities of the KST dating back to 2001, characterizing it as a violent street gang, and recounting controlled drug purchases dating back to February, 2004. The affidavit identified the victim as a KST member, as well as three individuals who witnessed the homicide or its immediate aftermath, including one who testified at trial.

The Commonwealth opposed the motion for a new trial, contending that the Slattery affidavit, while truthful, drew its conclusions mostly from events that occurred following the defendant's January, 2005, trial. In addition, the Commonwealth argued that the impeachment information would have been of negligible value to the defendant at trial, because the testimony of the non-KST witnesses corresponded nearly perfectly with that of the KST witnesses, and because the defendant failed to develop at trial any specific information about KST's gang activity or motives. The judge rejected the Commonwealth's arguments. In the judge's view, the defendant might have used this evidence both to bolster his argument for the reduced charge of manslaughter based on the use of excessive force in self-defense, and to impeach the eyewitnesses.

The Commonwealth moved for reconsideration and to supplement the record with the Framingham police department's "master" files on the individuals who witnessed the homicide or testified at trial. Comparing the master files to the board of

probation records of these individuals (which had been disclosed to defense counsel in pretrial discovery), the Commonwealth argued that the discrepancies between them were negligible. After review, the judge denied the Commonwealth's motion for reconsideration. The Commonwealth's appeal was consolidated with the defendant's direct appeal in this court.

We conclude that the judge did not abuse her discretion or commit any other error of law in granting the defendant's motion. We therefore affirm the allowance of the motion for a new trial.

2. *The trial.* We summarize the facts and testimony at trial, limiting ourselves to those facts pertinent to the present appeal.

a. *The witnesses.* Because one basis for granting a new trial was the potential for impeachment, we begin by cataloging the people who observed the events in question.

At least eight persons associated with the KST observed the shooting or its immediate aftermath. Anthony Campbell and Richard Jamal Waters witnessed the shooting and testified. Franklin Porter and Emmanuel Osamwonyi were present but did not testify. Dammond Bonner and Hector Perez arrived at the scene immediately after the shooting and testified. James Salvi and Diana Paul arrived immediately after the shooting but did not testify.

Three individuals not associated with the KST witnessed the homicide. Jerome Jones and Randy Lopez testified,[1] while Paul Pervis did not testify. The defendant, who was not associated with the KST, did not testify, but his oral and written statements to police were introduced in evidence through the testimony of the State trooper who took them.[2]

Numerous law enforcement and forensic investigators testified about the crime scene and the investigation. Among these, Detective Theodore Piers of the Framingham police department and State Trooper Richard Mahoney were questioned about the KST.

---

[1]Lopez testified under a grant of immunity.

[2]To simplify witness affiliation, we will often append the parenthetical (KST) to the name of each KST-affiliated witness, and the parenthetical (non-KST) to the other eyewitnesses. We will sometimes refer collectively to Campbell, Waters, Bonner, and Perez as the "KST witnesses," and to the stories of Jones, Lopez, and the defendant as the "non-KST accounts."

b. *The homicide.* At approximately 9 P.M. on October 7, 2003, the defendant shot the victim in front of 111 Kendall Street in Framingham. The defendant had known the victim for maybe a "month or two" prior to the homicide. Bonner (KST) had seen the defendant "around town" at different spots, and at times with the victim. According to both Bonner and Lopez (non-KST), there were no evident problems between the two. In his oral statement to the police, the defendant claimed that he had purchased marijuana from the victim, and that the victim was a friend.

On the afternoon of the shooting, however, the defendant and the victim exchanged heated words at the Beaver Park apartment complex in Framingham, and they began "messing around." It was unclear to Jones (non-KST) whether the two men were serious or just joking. The defendant asked the victim if he and the KST were going to rob him. The victim did not respond, and according to Lopez (non-KST), they then started "arguing and yelling." The defendant's girl friend's pit bull terrier started barking and growling. The defendant placed his hands on the front of the victim's pants, and the victim placed his hands on the defendant's wrists, as if to push them off. The victim left while the defendant and the others stayed behind.

At approximately 9 P.M. that evening, the defendant drove himself, Jones, Pervis, and Lopez (all non-KST) to Kendall Street. The defendant walked into the center of the street, followed by Lopez, and approached the victim. The victim and his friends were congregated in front of a house at 116 Kendall Street, where members of the KST gathered to "hang out." Those present included Campbell, Waters, Porter, and Osamwonyi (all KST).[3]

Campbell (KST) heard someone say "there they are or here they come." The victim stepped forward from the group to face the defendant. The defendant came to within four or five feet of the victim, who made a movement with his arms, but did not display any weapon.

The victim then spoke to the defendant; according to some witnesses, he challenged the defendant to fight. Jones (non-KST) testified that the victim said: "Let's shoot the ones" or

---

[3]Dammond Bonner, Diana Paul, and James Salvi (all KST) had recently left the scene, but would return shortly.

"Let's just have a one on one." Jones understood this to mean that this was an invitation for a fist fight. Lopez (non-KST) testified that the victim "was talking to [the defendant] . . . . He probably was swearing, but I don't remember. All I remember is I know he had his hands out and they . . . looked [like] they was going to fight." Campbell (KST) testified that he could not hear what the victim said to the defendant.

According to non-KST accounts, people in the KST group behind the victim began threatening the defendant. The defendant wrote in his statement that he heard a call to get weapons: "[The victim] asked me, 'What's up now?' One of his boys shouted, 'Yo, go get the shit, yo. I knew he meant to go get their guns. They all started running at me. I was backing up. I was scared because all of them guys running at me and reaching for stuff. [The victim] is a big dude. It was just me and [Lopez] there." Similarly, Lopez (non-KST) heard one of the people behind the victim say, "You trying to bring it to my man? You wanna get popped?" Campbell and Waters (KST) recounted the episode without recollecting any such statements.[4]

The defendant pulled out a gun from his hooded sweatshirt[5] and rapidly fired at least four times at the victim, who fell to the ground. Perez (KST), who had just left a nearby building, saw the defendant clutching the gun in his right hand as he and Lopez ran back to their vehicle. Bonner, Paul, and Salvi (all KST), who had just returned to the scene (see note 3, *supra*), helped Campbell get the victim into the passenger seat of Campbell's automobile. Campbell drove the victim to a hospital (following behind a vehicle with Bonner and Paul) where he was pronounced dead.

The police picked up the defendant and Lopez the next morning. Trooper Mahoney and then-Detective Sergeant Slattery interviewed the defendant, who eventually confessed to shooting the victim and provided two written statements.

[4]Jones (non-KST) specifically testified on cross-examination that he did not hear the victim call for weapons.

[5]The defendant wrote that he retreated to his vehicle, retrieved a gun, and then fired. No other witnesses confirmed this sequence. The defendant's account was inconsistent with forensic evidence regarding the location of the shell casings.

c. *Defendant's theory of manslaughter based on the use of excessive force in self-defense.* At trial, the defendant pursued a theory of manslaughter based on the use of excessive force in self-defense.[6] Defense counsel attempted to lay a foundation for this defense in several ways. First, he sought to elicit testimony concerning the victim's prior violent acts. The judge ruled such questions inadmissible, because the defense could not establish that the defendant was personally aware of those acts. See *Commonwealth* v. *Fontes,* 396 Mass. 733, 735-736 (1986). Second, he asked the KST witnesses whether members of their group were carrying weapons that day. They all responded in the negative. Third, he repeatedly called attention to the victim's large size. At five feet, ten inches tall, and weighing 233 pounds, the victim was approximately five inches taller and sixty pounds heavier than the defendant.

Most important for our purposes, defense counsel questioned seven witnesses about the gang activity of the KST. Because the KST testimony is the basis of the present appeal, we will recount it in detail, in the order that it was presented at trial.

d. *Testimony about the KST.* Defense counsel asked Campbell (KST) whether he knew of the KST gang. Campbell replied that the KST was not a gang but a group of friends. Campbell testified that he himself was a member but that the defendant was not. The judge sustained an objection to the question whether the victim was a member.

Detective Piers was the next to testify about the KST. Defense counsel asked Piers if he was familiar with KST and who its members were. The judge directed defense counsel to use the word "group" to describe the KST, rather than "gang." Piers testified that while he knew the "KS" stood for Kendall Street, he did not know what the "T" stood for. Piers identified Campbell, Bonner, Perez, and Porter as members. Piers was not sure whether the victim was a member as of 2003, but he recalled that the victim "has been associated with that name."

When Waters (KST) took the stand, defense counsel pointed out the tattoo of "KST" imprinted on the side of his neck.

---

[6]The defendant also sought an instruction on manslaughter based on reasonable provocation; however, the judge found that the facts did not support that theory.

Waters stated that the "KS" stood for "Kendall Street." According to Waters, the KST consisted of "a bunch of kids that's growing up" and that he had been in the KST since he was young. There were less than twenty-five people in KST, but Waters stated that they "were all just a group, just a bunch of kids. It's not nothing serious." He testified that Bonner, Porter, and Porter's brother were members; Campbell and the victim were not.

Bonner (KST) testified that he was a member of the KST, which stood for "Kendall Street." KST was "just a bunch of kids; we came up together. I lived on Kendall Street. That was pretty much where we hung out at." Bonner identified Salvi, Waters, and Porter as members of the KST. Defense counsel asked whether the victim was a member, and Bonner replied, "We associated with him." When pressed to clarify, Bonner said, "I mean I hung out with him on a daily basis so." Counsel asked again whether the victim was an official member, and Bonner replied, "[I]t wasn't like official or unofficial. It wasn't that type of status between all of us." Perez (KST) briefly testified that he was a member of the KST, as were Bonner, Campbell, Waters, and the victim.

On direct examination, Lopez (non-KST) testified that the defendant asked the victim at the Beaver Park apartment complex whether he and the KST were planning to rob him. He also testified that KST stood for "Kendall Street Team" and consisted of the victim, Porter, Salvi, Waters, "and all the other kids they hang around with." Trooper Mahoney testified to his knowledge of a group of men who call themselves the KST, which he stated stood for "Kendall Street Team and just Kendall Street. That's where they hang around." He testified that many of the individuals who witnessed the homicide were members of the KST.

e. *Closing arguments.* At closing, defense counsel pieced together the evidence that supported the defendant's reasonable belief in the need for self-defense. This evidence consisted of the threat to rob the defendant made earlier in the afternoon; the call to fight from the KST group heard by Lopez and the defendant just before the homicide; and the size difference between the victim and the defendant. Defense counsel argued that the defendant was justified in being fearful when he confronted the

victim on the evening of October 7: "[D]on't mistake this at all. [The victim] was a member of a gang. And he had all his guys with him too . . . . Let me tell you this is no basketball team, all right, the Kendall Street Team. It's no basketball team."

In the Commonwealth's closing, the prosecutor disputed that the KST gave the defendant any reason to be fearful: "I suggest to you ladies and gentlemen, there was no evidence that [the victim] was a big, bad gang member. Yeah, he had a group of friends that he hung out with, and some of them had tattoos of KST, but you didn't hear any evidence that [the victim] was after [the defendant] or had been stalking [him] to the point that [he] was going to be afraid."

The jury returned verdicts of guilty of murder in the first degree based on deliberate premeditation and unlawful possession of a handgun.

3. *Posttrial proceedings.* a. *The Slattery affidavit.* On June 21, 2007, more than two years after the defendant's trial, State and Federal prosecutors indicted twenty members of the KST on Federal and State drug charges. The arrests marked the culmination of an investigation of the KST beginning in 2004 called "Operation Thunderdome." Lieutenant Slattery submitted an affidavit to the Federal court in support of pretrial detention (affidavit). The affidavit relied on information gathered about the KST since 2001.

The affidavit characterized the KST, which stood for "Kendall Street Thugs" or "Kendall Street Team," as a "violent street gang operating in Framingham." The affidavit further described the KST as "a loosely organized group of individuals responsible for a disproportionate share of the drug trafficking and gang violence in Framingham."

The affidavit specifically referenced the death of the victim as an example of the KST's violence. "I am aware of numerous stabbings and shootings committed by and against members of KST. For example, on October [7], 2003, KST member Joseph McDaniel[], [also known as] 'Joe Bucks,' was shot and killed on Kendall Street in the presence of many KST members. A shrine was built at the scene of McDaniel['s] murder with the words 'Stop Snitchin' prominently displayed as a warning to anyone who contemplated cooperating with the police."

The affidavit recounted the KST's violent acts. "Framingham police have responded to numerous community complaints about drug dealing, harassment, and assaults by KST members and associates." KST members and associates "have committed crimes including firearm possession, drug distribution, discharging firearms at persons, physically beating people with bats or stabbing them with knives, sexually accosting females, and assaulting police officers." They "often arrive to fight in groups of [eight to ten] people in an effort to intimidate others."

According to the affidavit, KST members often displayed their solidarity with each other by wearing tattoos or similar articles of clothing. "For example, at the 2003 Boston Marathon, KST members made their presence known by wearing oversized white shirts imprinted with K.S.T. Some KST members wore shirts that depicted guns firing bullets bearing the words 'KST ain't no joke.' "

The affidavit further noted that "KST members will rarely cooperate with police; even when they are the victims of violent crimes they typically refuse to cooperate." As an example, when Robert McDaniel, the victim's brother, was shot and nearly killed in 2005, he refused to assist police in investigating his assailant.[7]

b. *Posttrial motions.* The defendant filed a motion for a new trial in this court on January 29, 2008, on the basis of the Commonwealth's failure to disclose potentially exculpatory evidence.[8] The motion was remanded to the Superior Court for disposition.

The defendant simultaneously moved for postconviction discovery of additional exculpatory evidence related to the KST. The Commonwealth opposed the motion for new discovery. After a hearing, the judge concluded that the motion for a new trial could be decided on the basis of the materials already submitted by the defendant.

After a nonevidentiary hearing, the judge granted the motion for a new trial. The Commonwealth moved for reconsideration, supporting its motion with supplemental discovery. After review, the judge denied the motion for reconsideration.

---

[7]The affidavit also detailed specific incidents of controlled drug purchases between February, 2004, and June, 2007.

[8]The defendant proffered three other bases for a new trial, but the judge rejected them.

c. *The judge's findings.* The judge articulated her basis for granting a new trial in a thoughtful and thorough memorandum. We present the well-settled legal principles on which the judge based her ruling and the judge's application of those principles to the facts of this case.

"The trial judge upon motion in writing may grant a new trial at any time if it appears that justice may not have been done." Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001). One well-settled justification for ordering a new trial is the failure to disclose exculpatory evidence. See *Commonwealth* v. *Tucceri,* 412 Mass. 401, 404-409 (1992); *United States* v. *Agurs,* 427 U.S. 97, 107 (1976); *Brady* v. *Maryland,* 373 U.S. 83, 87 (1963).

To secure a new trial on the basis of exculpatory evidence, the defendant must establish three elements. First, the evidence must have been in the possession, custody, or control of the prosecutor or a person subject to the prosecutor's control. Mass. R. Crim. P. 14 (a) (1) (A), as amended, 444 Mass. 1501 (2005); *Commonwealth* v. *Beal,* 429 Mass. 530, 531 (1999). A police officer is subject to the prosecutor's control when he acts as an agent of the government in the investigation and prosecution of the case. *Id.,* citing *Kyles* v. *Whitley,* 514 U.S. 419, 437 (1995). In the present case, Lieutenant Slattery interviewed the defendant on the morning after the homicide. The judge found that this involvement triggered a duty on the Commonwealth to disclose all information in Slattery's possession.

Next, the defendant must establish that the evidence is exculpatory. " 'Exculpatory' in this context is not a narrow term connoting alibi or other complete proof of innocence, . . . but rather comprehends all evidence 'which tends to "negate the guilt of the accused" . . . or, stated affirmatively, "supporting the innocence of the defendant." ' " (Citations omitted.) *Commonwealth* v. *Healy,* 438 Mass. 672, 679 (2003), quoting *Commonwealth* v. *St. Germain,* 381 Mass. 256, 261 n.6 (1980). Favorable evidence "need not be dispositive evidence." *Commonwealth* v. *Daniels,* 445 Mass. 392, 401 (2005).

The judge found that the evidence was potentially exculpatory in three ways. First, the defendant could have used Slattery's knowledge of the KST's gang violence to support his

contention that he was fearful for his life on the night of October 7, 2003. Of course, as the judge noted, to use the evidence this way, the defendant would have had to establish that he possessed such knowledge on that night. See *Commonwealth* v. *Adjutant*, 443 Mass. 649, 654 (2005).

Second, the defendant could have used the information gathered in the KST police investigation to impeach the KST witnesses by contradiction. The KST witnesses all testified that KST was not a gang but merely a group of friends who grew up together. Although whether the KST was a gang (selling drugs and engaged in violent activity) was a collateral matter, the judge noted that it would have been within her discretion to admit evidence about the KST for the purpose of impeachment. See *Commmonwealth* v. *Ferguson*, 425 Mass. 349, 355 (1997).

Third, the defendant could have used the evidence to impeach the KST witnesses for bias. "A criminal defendant has the constitutional right to cross-examine a prosecution witness to show bias," and "the judge has no discretion to bar all inquiry into the subject" even if the possibility of bias is remote. *Commonwealth* v. *Noeun Sok*, 439 Mass. 428, 435 (2003), quoting and citing *Commonwealth* v. *Tam Bui*, 419 Mass. 392, 400, cert. denied, 516 U.S. 861 (1995). Gang affiliation may serve as motivation for witnesses to protect themselves and their allies. *Commonwealth* v. *Noeun Sok, supra.* The judge noted that, according to the affidavit, KST members rarely cooperate with the police even when they are victims. The evidence in the affidavit would therefore have been admissible to show the witnesses' motive to lie.[9]

Finally, after showing that the withheld evidence was potentially exculpatory, a defendant seeking a new trial must establish

---

[9]We discern another way that the affidavit could have been used to impeach the KST witnesses. In addition to denying that the KST was a gang, the KST witnesses also avoided admitting that the victim was a part of their group. Waters flatly denied that the victim was a member of the KST, and Bonner prevaricated, conceding only, "We associated with him." See *supra* at 16. The Slattery affidavit, however, suggests that the victim was an esteemed member of the KST, with a street name of "Joe Bucks," and for whom KST built a shrine. The Slattery affidavit would thus have exposed the KST witnesses' willingness to lie rather than expose their affiliation with the victim.

prejudice. Because the evidence was not specifically requested by the defendant prior to trial, the standard of prejudice is the same standard used to assess the impact of newly discovered evidence, that is, "whether there is a substantial risk that the jury would have reached a different conclusion if the evidence had been admitted at trial." *Commonwealth* v. *Tucceri, supra* at 413, citing *Commonwealth* v. *Grace,* 397 Mass. 303, 306 (1986). The judge does not decide whether the verdict would have been different, but rather "whether the new evidence would probably have been a real factor in the jury's deliberations." *Commonwealth* v. *DiBenedetto,* 458 Mass. 657, 664 (2011), quoting *Commonwealth* v. *Grace, supra.*

The judge determined that the withheld evidence was indeed prejudicial: "The Slattery [a]ffidavit's description of KST's presence in Framingham as a gang responsible for 'a disproportionate share of the drug trafficking and gang violence in Framingham,' its naming of two witnesses to the victim's shooting as KST members, and its mention of the shrine KST erected at the scene of the victim's murder bolster [the defendant's] theory of the case, contradict the testimony of certain of the Commonwealth's witnesses, and demonstrate their motive to lie." Consequently, she concluded that there was a substantial risk that, if the jury had heard the evidence concerning the KST, they would have reached a different conclusion.

4. *Analysis.* a. *Standard of review.* We apply a deferential standard when reviewing the granting or denial of a motion for a new trial. We "will examine the motion judge's conclusion only to determine whether there has been a significant error of law or other abuse of discretion." *Commonwealth* v. *Grace, supra* at 307. We accord special deference to the action of a motion judge who was also the trial judge. *Id.,* citing *Commonwealth* v. *De Christoforo,* 360 Mass. 531, 543 (1971). "There is, therefore, a discretionary range . . . within which the trial judge may properly award a new trial, even if a new trial is not constitutionally required and even if we would not have granted a new trial on our own assessment of the record." *Commonwealth* v. *Tucceri, supra* at 409.

b. *Application.* Reviewing the judge's decision in the context of the record and the above legal principles, we cannot say that the judge abused her discretion in granting the motion for a new

trial. Each of the judge's findings is supported by the evidence before her, and demonstrates acute sensitivity to the testimony presented at trial.

Moreover, witness credibility played a central role in the jury's deliberation. The defendant argued that he felt reasonably fearful for his life on hearing threats of violence from the KST group behind the victim. But only the defendant and Lopez recalled hearing such threats; the KST witnesses (and Jones) claimed that they did not. The jury had to choose which version of events to believe. Had the jury discredited the KST defendants on the basis of impeachment by contradiction or bias, they might have credited the defendant's statements and Lopez's testimony on this matter, and thus it might have reached a verdict of manslaughter.

The Commonwealth makes several arguments on appeal, none of which persuades us that the judge abused her discretion.

Principally, the Commonwealth argues that Lieutenant Slattery's information was not exculpatory. While the affidavit vividly portrayed the KST's violence and intransigence with police, it provided no specific instances of violence, save for the victim's death, which took place before January, 2005. The only pretrial incidents of criminal activity by KST members prior to January, 2005, were a 2001 robbery by Salvi, which was disclosed before trial, and two controlled drug purchases in 2004 from two men who had no connection to the present case. Nothing in the Slattery affidavit suggests that the KST harbored gang-related ill will against the defendant, or that the KST, as an organization, had any role in the events on Kendall Street on the night of the crime.

The Commonwealth also argues, based on its supplemental discovery, that the defendant's lack of access to Lieutenant Slattery's material caused no prejudice. Prior to trial, the Commonwealth disclosed the court records of all persons who witnessed the homicide. In its supplemental discovery, the Commonwealth proffered the Framingham police "master" records concerning the same group. It contends that the differences between the court records and the police files are negligible. Besides, argues the Commonwealth, the defendant chose not to impeach any of the KST witnesses with their criminal records.

The Commonwealth misses the point. The value of the affidavit to the defendant consisted not in its specific allegations of criminal activity, but in its holistic portrayal of the KST as a violent gang and in its identification of the victim as an esteemed member. The evidence that the KST had the characteristics of such a gang was useful for impeachment, not merely through the criminal acts performed by individual witnesses, but through contradiction and bias regarding the testimony presented at trial.

The Commonwealth finally argues that impeaching KST's witnesses would have had minimal effect on the jury. The jury, it contends, heard very similar testimony from Campbell (KST) and Jones (non-KST) about how the homicide occurred, and the jury heard how KST members and the other individuals, such as Perez (KST) and Lopez (non-KST), were friendly toward each other. On this matter we must defer to the trial judge, who observed the jury and the witnesses, and who concluded that the impeachment would probably have been a real factor in the jury deliberation. *Commonwealth* v. *De Christoforo, supra.*[10]

The order granting the defendant's motion for a new trial is affirmed.

*So ordered.*

---

[10]Like the Superior Court judge, we do not insinuate that the prosecution acted wilfully in this matter. Nevertheless, we emphasize that in the case of important witnesses, even minor bases for impeachment are exculpatory. "[P]rosecuting attorneys [should] 'become accustomed to disclosing all material which is even possibly exculpatory, as a prophylactic against reversible error and in order to save court time arguing about it.' " Reporters' Notes (revised, 2004) to Mass. R. Crim. P. 14, Mass. Ann. Laws, Rules of Criminal Procedure, at 1490 (LexisNexis 2011-2012), quoting *Commonwealth* v. *St. Germain*, 381 Mass. 256, 262 n.10 (1980).