NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-09950

COMMONWEALTH  vs.  KYLE WATKINS.


Bristol.     January 9, 2015. - November 24, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, & Duffly, JJ.


Homicide.  Identification.  Evidence, Identification, Disclosure
    of evidence, Exculpatory, Third-party culprit, Hearsay.
    Due Process of Law, Disclosure of evidence.  Practice,
    Criminal, Capital case, Motion for a required finding, New
    trial, Disclosure of evidence, Agreement between prosecutor
    and witness, Prosecutor's conflict of interest, Conduct of
    prosecutor, Assistance of counsel.



Indictments found and returned in the Superior Court
Department on September 25, 2003.

    The cases were tried before E. Susan Garsh, J., and a
motion for a required finding of not guilty or, in the
alternative, for a new trial, filed on March 21, 2011, was heard
by her.


    Janet H. Pumphrey for the defendant.
    Shoshana E. Stern, Assistant District Attorney, for the
Commonwealth.


    DUFFLY, J.  In June, 2005, a Superior Court jury found the

defendant guilty of murder in the first degree in the April 26,

2003, shooting death of Paul Coombs on a New Bedford street.[1] The defendant appealed from his convictions and also filed in the Superior Court a motion for a required finding of not guilty, pursuant to Mass. R. Crim. P. 25(b)(2), as amended, 420 Mass. 1502 (1995), or, in the alternative, for a new trial, pursuant to Mass. R. Crim. P. 30(a), as appearing in 435 Mass. 1501 (2001). The defendant's motion for a stay of appeal was allowed so that he could pursue his motion in the Superior Court. After conducting an extensive evidentiary hearing, the motion judge, who had been the trial judge, denied both requests made in the motion. The defendant's appeal from that denial was consolidated with his direct appeal.[2]

The defendant argues, as he did in his motion for a new trial, that there was insufficient evidence to sustain his conviction. He argues further that a new trial is required because the Commonwealth failed to make mandatory disclosures of exculpatory evidence; the judge abused her discretion in allowing the Commonwealth's motion to exclude evidence of a third-party culprit, and in denying the defendant's motion to

---

[1] The defendant also was found guilty of unlawful possession of a firearm. G. L. c. 269, § 10 (b).

[2] The defendant appeals also from the denial of his motion for admission of exhibits at the hearing on the motion for new trial, and the denial, in part, of his motion to expand the record at that hearing. We discern no abuse of discretion in the motion judge's evidentiary rulings on these motions.

exclude hearsay testimony; there was prosecutorial misconduct; and his counsel was ineffective. The defendant also asks that we exercise our extraordinary power under G. L. c. 278, § 33E, to reduce the degree of guilt.

We affirm the convictions and the denial of the motion for a new trial, and discern no reason to reduce the degree of guilt pursuant to G. L. c. 278, § 33E.

Facts. We summarize the facts the jury could have found, reserving certain facts for later discussion.

On the evening of April 25, 2003, the defendant was at a private club on Mill Street in New Bedford, where he spent fifteen minutes loudly arguing on his cellular telephone with the victim. Vernon Rudolph, a long-time friend of both the victim and the defendant, was also present at the club. Through a window, Rudolph saw the victim "frisking" people on the sidewalk who were attempting to enter the club, and suggested that the defendant should go outside and engage in a fist fight with the victim, who was much larger than the defendant. The defendant declined, and he did not leave the club until after the victim had left the area.

The following morning, April 26, 2003, the victim told his girl friend that he wanted to "whoop" the defendant. That afternoon, the defendant was again at the club. He seemed upset and told the bartender that he was "tired of people [messing]

with him."  The defendant returned to the club that evening, but was now acting "tough" and saying that "[t]hings are going to change around here."  He left the club at some point after 9:30 P.M., wearing a black hooded sweatshirt, black jeans, white and black sneakers, and batting gloves.  At approximately 9:50 P.M. that evening, the victim and his girl friend were talking by telephone.  At the end of the call, the girl friend heard the victim shout, "Why don't you fight me now?"  At about the same time, sisters Ernestina and Beatriz Soares[3] were driving on Cedar Street, approaching the intersection with Mill Street.  Ernestina, the driver, waited at the intersection, where vehicles moving in their direction encountered a stop sign, because a blue Lincoln Mark VIII automobile was stopped on Mill Street and had the right of way.  The Mark VIII flashed its head lights, and Ernestina turned left onto Mill Street.  The windows of the Mark VIII were dark, and Ernestina could not see if there was anyone in the vehicle.

As they drove down Mill Street, the sisters saw a man standing next to a Honda Accord automobile parked on the left side of the street, and another man standing on the opposite sidewalk.  They described the man on the sidewalk as approximately six feet tall, well built, and African-American.

---

[3] Because Ernestina Soares and Beatriz Soares share a last name, we refer to them by their first names.

He was bald or had a receding hairline, and was wearing dark clothing, including a hooded sweatshirt.[4]  The man standing by the Honda was "yelling" across the street, "Don't [mess] with me.  I'm not the one to be [messed] with."  After driving past, Ernestina saw the man who had been standing on the sidewalk approach the Honda and raise his hand; the sisters then heard multiple gunshots.  While they proceeded further down Mill Street, Beatriz telephoned 911.

Also at approximately 9:50 P.M. that evening, Michael Couture was driving on Cedar Street approaching the intersection with Mill Street.  Like the Soares sisters, he waited at the intersection because a stopped automobile on Mill Street had the right of way.  When a white automobile started to swerve around the stopped vehicle, Couture drove through the intersection.  He heard a loud noise to his left and saw a man fire multiple shots at a parked vehicle.  Couture described the man as an African American, between six feet and six feet two inches tall, with a slim to medium build.  The shooter was wearing dark clothes, including a mask, hat or hood.

---

[4] Beatriz described the man as being African-American, about six feet tall, 220 or 230 pounds, well built, either bald or with a receding hairline, and dressed in dark clothing, including a hooded sweatshirt.  Ernestina described the man as being a light-skinned African-American, possibly Spanish or Cape Verdean, between six feet and six feet two inches tall, 220 or 240 pounds, well built, bald, and dressed in dark clothing, including a hooded sweatshirt.

At approximately the same time, Rudolph, who had left the club at about 9:40 P.M., was driving down Mill Street in his white Nissan Maxima automobile. As he approached the intersection with Cedar Street, he encountered a blue Lincoln Mark VIII with tinted windows blocking his way. He was swerving around the Mark VIII when he saw a man he recognized as the defendant standing in front of a parked vehicle on the other side of the intersection; the defendant was wearing the same clothing he had been wearing at the club. Rudolph saw the defendant step back and fire seven to eight shots at the parked vehicle. Rudolph, who had known the defendant from childhood, recognized the defendant's face when the defendant's hood slipped backwards as he fired. Rudolph also recognized the defendant by his body actions and by the way that he "bounce[d]." Rudolph drove to his mother's house and told her that he had just witnessed a shooting. His mother testified at trial that Rudolph arrived at 10 P.M. that evening, and stated that he had recognized the shooter, but refused to disclose the shooter's identity.

Officer Bryan Safioleas of the New Bedford police department was the first police officer to arrive at the scene of the shooting. Safioleas had been parked approximately one-half block away from the intersection of Mill and Cedar Streets until 9:40 P.M., and had noticed a blue Lincoln Mark VIII with

tinted windows drive around the block a "couple" of times.  When Safioleas reached the Honda, the victim was unconscious and was bleeding from multiple gunshot wounds; he and another officer removed the victim from the Honda and attempted to administer CPR.  After emergency medical technicians arrived, the victim was transported by ambulance to a local hospital, where he was declared dead.

Although police officers immediately identified the defendant as a suspect, they were unable to locate him for more than three months; the defendant's friends and acquaintances likewise did not see him after the shooting.  Officers were able to locate the blue Lincoln Mark VIII.  It had been wiped clean so that no fingerprints were identifiable either on the inside or outside of the vehicle.  Ultimately, police linked the defendant to the vehicle.[5]

On August 5, 2003, State troopers arrested the defendant in Lynn, after troopers conducting surveillance of the area near a particular address saw the defendant entering a restaurant. When officers approached the defendant, he provided a false name and produced a driver's license in that name.  He was unable to

---

[5] Police learned that the defendant had asked a friend to register the Lincoln Mark VIII in her name, but had paid for the costs of registering and insuring it; the friend never drove the Mark VIII.  The victim's girl friend had seen the defendant in the Mark VIII, and the defendant's girl friend's landlord had taken a photograph of the Mark VIII parked in the defendant's girl friend's driveway.

state the date of birth on the license, however, and after admitting his real identity, was placed under arrest. When a New Bedford police officer arrived to transport the defendant back to New Bedford, he noticed that the defendant was unshaven and sweating, was wearing a soiled T-shirt, and had lost weight. When the officer told the defendant that he looked "bad," the defendant responded that he was under a lot of stress. During the drive to New Bedford, the defendant remarked that he was "enjoying the ride." The officer noted that there was not much to see because it was dark and they were driving on a highway, to which the defendant replied that he still was enjoying the ride because it was "going to be the last ride he was going to have for a long time."

The defendant did not testify. He called one alibi witness, Joseph Correia, who testified that he was in the club with the defendant until about 10:45 P.M. on the evening of the shooting.

The theory of defense focused on impeaching Rudolph's credibility. Defense counsel elicited testimony that the weather on the night of the shooting was foggy and rainy, and that Rudolph was almost a block away from the Honda when the shots were fired. Counsel also elicited testimony that Rudolph had not agreed to speak with police until after he learned that police were seeking to speak with him and his brother, and that

Rudolph and the prosecutor had entered into an agreement that resulted in Rudolph's early release from incarceration.

Discussion. The defendant raises a myriad of claims on appeal, all of which were considered and denied by the trial judge, in an exhaustive, detailed, and thoughtful eighty-page memorandum of decision, after an extensive, four-day hearing[6] on the defendant's motion for a required finding under Mass. R. Crim. P. 25, or for a new trial under Mass. R. Crim. P. 30.

The defendant's brief reiterates all of the evidentiary issues that were considered and rejected by the motion judge, who discredited several of the witnesses and found explicitly, contrary to the defendant's repeated assertions, that the prosecutor did not lie, there was no prosecutorial misconduct, and there was no conflict of interest between the prosecutor and the defendant's trial counsel.[7]  As to certain claims, the

---

[6] Most of the Commonwealth's trial witnesses testified at the hearing.  A number of witnesses who had not been part of the original trial either testified or submitted affidavits for the defense, and additional discovery, that the defendant had not received prior to trial, was admitted in evidence.  The judge also considered additional documentary evidence and affidavits by witnesses who did not testify at the hearing, which she allowed to be introduced on the defendant's motion to reopen the evidence, more than five months after the hearing.

[7] The only claim in his motion for a new trial which the defendant does not pursue on appeal concerns an assertion that he was denied the right to a public trial because the court room was closed during jury empanelment.  As to that claim, the motion judge found that several of the witnesses were not credible; she noted particularly that she was very familiar with the right of public access during jury voir dire, and had been

defendant asserts facts, without comment, directly contrary to what the motion judge found.  For instance, the defendant states that his counsel's "complete failure" to impeach the Commonwealth's primary witness requires a new trial, whereas the judge found that defense counsel "thoroughly" impeached the principal witness, and strategically chose to focus the jury's attention on those areas, among the many possible grounds for impeachment, that he deemed the most effective.  In some of his other claims, the defendant's brief simply asserts, without explanation, that the motion judge's evidentiary and credibility rulings were clearly erroneous, and then reiterates the arguments made in his motion for a new trial.

Having carefully reviewed all of the defendant's claims, we limit our discussion to those claims which rise to the level of appellate argument.  See Mass. R. A. P. 16 (a) (4), as amended, 367 Mass. 921 (1975).  See, e.g., Commonwealth v. Harbin, 435 Mass. 654, 661 (2002).  Because many of the issues raised involve credibility determinations which were before the motion judge, we note the deference we accord a motion judge's findings of fact, made after an evidentiary hearing, if supported by the record, Commonwealth v. Walker, 443 Mass. 213, 224 (2005), and the special deference given to the action of a motion judge who,

"particularly vigilant in ensuring that accommodations were made for the public to attend all phases of the trial, including jury selection."

as here, was also the trial judge. See Commonwealth v. Grace, 397 Mass. 303, 307 (1997), citing Commonwealth v. De Christoforo, 360 Mass. 531, 543 (1971).

1. Sufficiency of the evidence. In reviewing whether the evidence at trial was sufficient to support a conviction, we consider "whether the evidence, in its light most favorable to the Commonwealth, notwithstanding the contrary evidence presented by the defendant, is sufficient . . . to permit the jury to infer the existence of the essential elements of the crime charged" (quotation omitted). Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979). "Additionally, the evidence and the inferences permitted to be drawn therefrom must be of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of [guilt] beyond a reasonable doubt" (quotation and citation omitted). Id. at 677. "As long as the inferences are 'reasonable and possible,' the evidence may be wholly circumstantial." Commonwealth v. Forte, 469 Mass. 469, 482 (2014), quoting Commonwealth v. Linton, 456 Mass. 534, 544 (2010).

The focus of the defendant's sufficiency argument is Rudolph's identification of him as the shooter. The defendant contends that it would have been physically impossible for Rudolph to identify him, given that it was dark, foggy, and

rainy,[8] and that Rudolph was almost a block away from a shooting that lasted only for a few seconds.  The defendant argues also that police coerced Rudolph's testimony by suggesting that he or his brother might be considered suspects if he did not testify against the defendant, and that the evidence at trial showed that Rudolph lied about the distance between the intersection and the parked Honda where the victim was shot.[9]  All of the defendant's arguments, however, concern the weight and credibility of Rudolph's testimony, which is the province of the jury.  See Commonwealth v. Fitzgerald, 376 Mass. 402, 411 (1978) ("Credibility is a question for the jury to decide; they may accept or reject, in whole or in part, the testimony presented to them").

---

[8] Responding officers testified that, although there was some fog, the fog was "misty" rather than dense, it was more rainy than foggy, and they were able to see from the scene of the shooting to the private club on another block where the defendant and Rudolph had been earlier in the evening.  This testimony is supported by photographs of the scene taken shortly after the shooting.

[9] Rudolph testified that the Honda was in front of the fire hydrant near the NAACP building when the shooting took place (the "tail end of [the] car was just about at the fire hydrant"), and rolled slightly to the location where it was found (close to a later-established memorial, on the fence surrounding the NAACP building's parking lot) after the shooting.  Other witnesses said that, at the time of the shooting, the vehicle was near the site of the memorial, approximately one hundred feet from the corner (Honda was "a short distance in front of the fire hydrant, maybe a little more up"; "right next to the NAACP building";  and "relatively close" to area of current memorial).  When police arrived, the Honda was near the location of the current memorial.

A rational juror could have believed Rudolph's testimony that he saw the defendant shoot the victim. Among other things, this was not a stranger identification. Rudolph testified that he had known the defendant since childhood, they had grown up together, and he recognized the defendant's clothing and movements even before he saw the defendant's profile when his hood slipped. The jury also took a view of the scene, standing at the northeast corner of Mill and Cedar Streets, and then walking a short way down Mill Street. The prosecutor pointed out to them the location of the fire hydrant, the stop sign at the corner, the NAACP building that is the first building on the street, and the location of the next street. The jury were able to decide for themselves what would have been visible from the corner, the distance to the fire hydrant, and the distance to the memorial on the fence surrounding the NAACP building, slightly farther along Mill Street than the fire hydrant. The jury also were able to determine from the crime scene photographs the distance between the location where the green Honda was found and the fire hydrant.

Moreover, and notwithstanding the defendant's statements to the contrary, although Rudolph was the Commonwealth's primary witness, his testimony was far from the only evidence tying the defendant to the shooting. Three bystanders driving past near the time of the shooting provided descriptions of the shooter

and his clothing that were consistent with each other and with the defendant's physical characteristics and the clothing that Rudolph testified the defendant had been wearing.  Several witnesses, including the victim's girl friend, were aware that the victim and the defendant had been in an argument and that the defendant wanted to "fight" the victim.  The Mark VIII that the defendant had arranged to be registered in a friend's name, and which he drove, matched the description of the vehicle seen at the corner of Mill and Cedar Streets shortly before the shooting, and a Mark VIII, wiped clean of fingerprints and other possible evidence, was located by police early in the investigation.  See note 5, supra.

In addition, a rational juror could have inferred that the defendant's actions after the shooting indicated consciousness of guilt.  The defendant fled from New Bedford to Lynn after the shooting, where he was living under a false name.  He offered a false name to police when they first apprehended him in Lynn, and made several seemingly inculpatory statements during the drive in a police cruiser from Lynn to New Bedford, among them that the drive was "going to be the last ride he was going to have for a long time."

The evidence was sufficient to support the defendant's conviction.

2.  Failure to disclose exculpatory evidence.  The

defendant argues that the Commonwealth failed to disclose a number of pieces of exculpatory evidence, contrary to the due process requirements of the Fourteenth Amendment to the United States Constitution, art. 12 of the Massachusetts Declaration of Rights, and Mass. R. Crim. P. 14, as appearing in 442 Mass. 1518 (2004).  See Brady v. Maryland, 373 U.S. 83, 87 (1963).  See also Commonwealth v. Williams, 455 Mass. 706, 714 (2010).  Evidence is exculpatory if it "provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness."  Commonwealth v. Daniels, 445 Mass. 392, 401-402 (2005), quoting Commonwealth v. Ellison, 376 Mass. 1, 22 (1978).

To obtain a new trial when exculpatory evidence has been withheld, a defendant "must establish prejudice."  Commonwealth v. Murray, 461 Mass. 10, 20-21 (2011).  Where a defendant requested specific exculpatory evidence prior to trial, the defendant must demonstrate only the existence of a substantial basis for claiming prejudice.  Commonwealth v. Daniels, supra at 404-405.  Where, on the other hand, a defendant's pretrial motion was merely a general request for exculpatory evidence, the defendant must show that the withheld evidence "would probably have been a real factor in the jury's deliberations."

See Commonwealth v. Murray, supra at 21, quoting Commonwealth v. DiBenedetto, 458 Mass. 657, 664 (2011).

a. Crime scene diagram. The defendant argues that the Commonwealth failed to produce a hand-drawn crime scene diagram detailing the distance between the Honda Accord and shell casings found near the vehicle. The diagram shows the Honda as having been located part-way down the block from the intersection of Mill and Cedar Streets. The defendant contends, as he did in his motion for a new trial, that he could have used this diagram to impeach Rudolph's testimony that the shooting occurred near the intersection. The motion judge treated this diagram as having been specifically requested by the defendant prior to trial, but concluded that the defendant had no substantial basis for claiming prejudice resulting from the Commonwealth's failure to disclose. We agree.

The hand-drawn diagram is not to scale. It was drawn by a crime scene investigator primarily to record the distance of each shell casing from the Honda. More importantly, the defendant has not shown that it would have been exculpatory. See Commonwealth v. Bresilla, 470 Mass. 422, 431 (2015), citing Commonwealth v. Williams, supra at 714. Safioleas, the first responding officer, testified at trial concerning the location of the Honda when he arrived at the scene, and his testimony corresponded generally to the location of the vehicle shown on

the diagram.  The defendant also was able to impeach Rudolph's testimony regarding the location of the shooting with contradictory testimony from Beatriz and Couture.  The diagram would have served only as weak and cumulative impeachment evidence.  See Commonwealth v. Vieira, 401 Mass. 828, 838 (1988).

b.  Nature of Rudolph's incentive agreement.  The defendant contends that the Commonwealth concealed the true nature of the agreement between Rudolph and the prosecutor by not informing the defendant that (1) Rudolph would be released on the day that he testified; (2) Rudolph had asked for favorable treatment at his dangerousness hearing following his December, 2003, arrest (subsequent to his initial statements to police); (3) Rudolph's former girl friend had telephoned the prosecutor asking for preferential treatment concerning her own pending felony drug charges; and (4) Rudolph purportedly received $5,000 from the New Bedford Chamber of Commerce following his testimony.  As the defendant argues, evidence of any understanding or agreement between the government and a key witness may be used to impeach that witness and is exculpatory.  Commonwealth v. Fisher, 433 Mass. 340, 358 (2001).

The motion judge found after hearing evidence on this issue that the Commonwealth did not conceal the nature of its agreement with Rudolph from the defendant, and the record amply

supports this finding. The prosecutor agreed to support Rudolph's request for early release, knowing that it would result in Rudolph's release from incarceration immediately after he testified, and knowing that Rudolph had an engineer who was prepared to testify that the school zone conviction against Rudolph could not stand because the location of his drug transaction was not within 1,000 feet of a school or park. The prosecutor sent a copy of this agreement to the defendant prior to the start of trial. Thus, there was no basis upon which the defendant legitimately could claim surprise or failure to disclose when Rudolph was released on the day that he testified.

There is likewise no merit in the defendant's remaining claims concerning the incentive agreement. The defendant suffered no prejudice by not learning that Rudolph had asked for favorable treatment at his dangerousness hearing. Rudolph did not receive favorable treatment at the hearing, and the agreement that Rudolph eventually reached with the prosecutor, provided to the defendant, clearly informed the defendant that Rudolph had been seeking an incentive in return for his testimony. The record does not support any favorable treatment of Rudolph's girl friend in her felony drug case, and the motion judge found that there was no indication that the Commonwealth gave preferential treatment to her, or that Rudolph requested such treatment. The motion judge also found that there was no

evidence or suggestion that the New Bedford Chamber of Commerce paid Rudolph $5,000, or any other amount, in return for his testimony. See Commonwealth v. Miranda, 458 Mass. 100, 105 (2010), cert. denied, 132 S. Ct. 548 (2011).

c. Police report on accidental shooting. The defendant asserts that the Commonwealth failed to provide the defendant with a police report detailing an incident in October, 2003, in which Rudolph accidentally shot himself in the finger. No charges were filed against Rudolph as a result of the incident. The motion judge found that, "while the evidence is far from conclusive," the Commonwealth most likely failed to provide the defendant with this report. The defendant argues that Rudolph avoided any charges because he told police that he was the key witness in the Commonwealth's case against the defendant. The judge found, however, that there was no evidence that investigating officers were aware that Rudolph was a Commonwealth witness, no evidence that he either sought or received favorable treatment in that matter, and that his anticipated testimony had no bearing on the decision not to prosecute Rudolph for "shooting himself." The record supports the judge's findings. The defendant therefore suffered no prejudice as a result of the Commonwealth's failure to disclose this police report.

3. Exclusion of third-party culprit evidence. The

defendant argues that the judge abused her discretion in allowing the Commonwealth's motion to exclude third-party culprit evidence.  Relatedly, he argues that the Commonwealth failed to disclose certain notes taken by one of the officers during Rudolph's first police interview, and that these notes would have bolstered his opposition to the Commonwealth's motion in limine to exclude.

"A defendant may introduce evidence that tends to show that another person committed the crime or had the motive, intent, and opportunity to commit it," Commonwealth v. Morgan, 460 Mass. 277, 291 (2011), quoting Commonwealth v. Lawrence, 404 Mass. 378, 387 (1989), and "[i]f the evidence is of 'substantial probative value, and will not tend to prejudice or confuse, all doubt should be resolved in favor of admissibility.'" Commonwealth v. Morgan, supra at 291, quoting Commonwealth v. Conkey, 443 Mass. 60, 66 (2004), S.C., 452 Mass. 1022 (2008). See Commonwealth v. Silva-Santiago, 453 Mass. 782, 801 (2009), and cases cited.

The introduction of such evidence, however, is not without limit.  The proffered evidence must have "a rational tendency to prove the issue the defense raises, and the evidence cannot be too remote or speculative" (quotation omitted).  Commonwealth v. Smith, 461 Mass. 435, 445-446 (2012).  In addition, because the evidence is "offered for the truth of the matter asserted,"

e.g., "that a third party is the true culprit," where third-party culprit evidence is hearsay that does not fall within a hearsay exception, it is admissible, in the judge's discretion, only if it is otherwise relevant and will not tend to prejudice or confuse the jury, and if there are "other substantial connecting links" between the proffered third-party culprit and the crime. Commonwealth v. Smith, supra.

Here, the defendant sought to introduce evidence that the victim had been convicted of manslaughter for the death of Zachary Suoto, and therefore that Barry Suoto,[10] Zachary's brother, had a motive to kill the victim on Zachary's birthday, April 26. The defendant argues that the judge abused her discretion in granting the Commonwealth's motion to exclude this evidence. He maintains that if he had had access to the notes of Rudolph's first interview with the police, he would have been successful in arguing against the Commonwealth's motion to exclude.

While another person's motive to commit the crime properly may be considered in determining whether third-party culprit evidence is admissible, it is far from the "sole factor." Commonwealth v. Morgan, 460 Mass. at 292. The defendant offered nothing in his opposition, nor does he offer anything on appeal,

---

[10] Because Zachary Suoto and Barry Suoto share a last name, we refer to them by their first names.

to indicate that Barry, who had been released from incarceration more than a year before the victim's death, had a then-present intent to kill the victim, or was even present in the same city at the time of the shooting.  The defendant also did not proffer any witnesses, affidavits, or other evidence that might have connected Barry to the killing.  See Commonwealth v. O'Brien, 432 Mass. 578, 589 (2000).  There was no abuse of discretion in the judge's conclusion that, in the absence of any such evidence, the admission of evidence that Barry might have had a motive to kill the victim on the date that the victim died was overly speculative and of little probative value, and would tend to prejudice and confuse the jury.

The notes of the police interview would have added little to suggest the judge should have reached a different conclusion and, to the contrary, tended to support her decision to exclude the proffered motive.  The notes state that Rudolph had spoken with Barry a few weeks prior to the shooting, and that Barry had told Rudolph that "it was behind him."  Barry also told Rudolph that he was afraid of the victim, and that "he did not hire a hitman."  The judge determined that the notes were not exculpatory because they did not support the defendant's theory that Barry killed the victim.  Rather, they supported the opposite inference.  We conclude that there was no substantial basis to support the defendant's claim of prejudice due to the

Commonwealth's failure to provide him with these notes. The notes would not have changed the judge's decision to allow the Commonwealth's motion to exclude the proposed third-party culprit evidence, where there were no substantial connections linking Barry to the crime. See Commonwealth v. Smith, 461 Mass. at 445-446.

4. Conflict of interest. The defendant argues that a new trial is required because the prosecutor had represented him on several previous occasions. The defendant made the same argument in his motion for a new trial, in which the judge found, after hearing testimony from the prosecutor and examining records of the defendant's prior cases, that there was no conflict.

A defendant who demonstrates an actual conflict of interest is entitled to a new trial, under both Federal and State Constitutions, unless he or she knowingly and voluntarily waived the conflict. See Commonwealth v. Holliday, 450 Mass. 794, 806, cert. denied, 555 U.S. 947 (2008). An actual conflict of interest arises if a prosecutor has formerly represented a defendant in a matter that is substantially related to the pending case. See Mass. R. Prof. C. 1.9(a), 426 Mass. 1342 (1998). If a defendant establishes only a potential or tenuous conflict of interest, however, the conviction will not be set aside unless the defendant demonstrates that the conflict

resulted in actual prejudice.  See Commonwealth v. Holliday,
supra.

The prosecutor represented the defendant as a public
defender in a 1986 probation surrender matter, a 1988 robbery
charge, and a 1989 charge of receiving stolen property and
possession of controlled substances.  None of these cases, each
of which ended many years before the current matter, is
substantially related to the murder case.  Contrary to the
defendant's argument, the fact that the stolen property matter
involved a nine millimeter handgun, the same caliber that was
used to kill the victim, does not make that case, more than
twenty years before the shooting, substantially related to the
current case, nor does it show that the prosecutor was exposed
to confidential information.  Indeed, the judge found that the
prosecutor's representation of the defendant had been "distant
and fleeting . . . on substantially unrelated matters" and that
he "acquired no facts upon which the prosecution of the
defendant was predicated."  Moreover, the record does not
indicate that the defendant ever informed his trial counsel,
either before or during trial, of a potential conflict of
interest by the prosecutor.  Nor did the defendant seek to have
the prosecutor disqualified on the ground of a potential
conflict.  In the absence of an actual conflict of interest, the
defendant must establish that the conflict resulted in actual

prejudice.  See id.  The defendant has not done so.[11]

5.  Prosecutorial misconduct.  The defendant raises
numerous claims regarding the prosecutor's purportedly improper
statements and arguments at trial, as well as the prosecutor's
conduct outside the court room.  We address the following three
claims, and discern no reason to address the remainder of the
claims, which were considered and rejected by the motion judge.

First, the defendant argues that the prosecutor knowingly
presented false testimony to the jury regarding the location of
the Honda at the time of the shooting.  See Commonwealth v.
Jewett, 442 Mass. 356, 362-363 (2004).  The defendant did not
object to this testimony at trial, and his claim is unavailing.
The basis of the claim rests on the fact that there was somewhat
differing trial testimony regarding the location of the Honda at
the time of the shooting.  Rudolph testified that the vehicle
was close to the fire hydrant located near the intersection,
while Beatriz stated that the Honda was a "little bit more up"
than a short distance in front of the hydrant.  That Rudolph's
testimony was to some extent contradicted does not establish
that it was false, or that the prosecutor knowingly and

---

[11] Although we conclude that there was no actual conflict of
interest in these circumstances, and no potential conflict
resulting in any actual prejudice, we emphasize that the better
practice for the prosecutor would have been to avoid the risk of
reversal of a conviction, following a later determination that
there was a conflict of interest, by simply choosing not to
prosecute a former client.

intentionally suborned false testimony, as the defendant contends.

Nor was the testimony about the location of the Honda significantly contradictory; Beatriz's testimony that the vehicle was a little farther up than the hydrant did not establish that Rudolph would have been unable to see the vehicle, and both he and a responding officer testified that they were able to see farther up the street, past the NAACP building and its parking lot beyond the fire hydrant.

Second, the defendant argues that the prosecutor committed "fraud on the court" by, inter alia, supporting the incentive agreement with Rudolph that had the effect of releasing him from incarceration immediately following his testimony. This claim is without merit. See Rockdale Mgt. Co. v. Shawmut Bank, N.A., 418 Mass. 596, 598 (1994), quoting Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 246 (1944). A prosecutor does not commit "fraud on the court" by facilitating the government's entry into a plea agreement with a key witness, properly disclosed to the defendant, and permissibly may argue that the witness's testimony is truthful, so long as he does not express a personal belief in the witness's credibility. See Commonwealth v. Caldwell, 459 Mass. 271, 280-281 (2011), and

cases cited.[12]

Third, the defendant argues that the prosecutor disregarded a pretrial order that precluded the Commonwealth from introducing evidence of an alleged threat to Rudolph as substantive evidence of the defendant's consciousness of guilt. In explaining in his closing argument why he had supported Rudolph's release from prison, the prosecutor stated: "Folks, what do you think Mr. Rudolph's life would be worth in prison after testifying?" Defense counsel objected, and the judge ordered the comment struck, instructing the jury to disregard the statement. "We presume that the jury followed the judge's instruction." Commonwealth v. Pillai, 445 Mass. 175, 190 (2005). Beyond the single passing comment in closing, the prosecutor made no mention of the threats against Rudolph's life that had been made by, among others, the defendant's brother, and that Rudolph had testified to in earlier proceedings.

6. Introduction of hearsay statements by victim's girl friend. The defendant argues that the judge erred in denying his motion in limine to exclude testimony from the victim's girl

---

[12] The defendant continues to argue on appeal that the prosecutor "knew" that Rudolph committed his drug offense within a school zone, and should not have agreed to an early release on that charge, notwithstanding the judge's finding that the prosecutor was aware that Rudolph had an engineer who intended to testify that Rudolph's drug offense had taken place close to, but outside, the 1,000-foot school zone. The defendant has not established by this argument that the prosecutor committed fraud on the court.

friend that, when she was speaking with him by telephone at approximately 9:50 P.M. on the evening of the shooting, she heard him say, "Why don't you fight me now?" The motion was considered at a hearing prior to opening statements but after the jury had been empanelled, and then again immediately before the girl friend testified, at which the parties and the judge reviewed and discussed each challenged statement. Trial counsel did not object as the statements were considered, and did not seek an ongoing objection at the end of the hearing, nor did he object when the statement was introduced.

"The broad rule on hearsay evidence interdicts the admission of a statement made out of court which is offered to prove the truth of what it asserted, [but] the state of mind or intent of a person, whenever material, may be shown by his declarations out of court" (quotations omitted). Commonwealth v. Qualls, 425 Mass. 163, 167 (1997), S.C., 440 Mass. 576 (2003). See Mass. G. Evid. § 803(3)(B)(i) (2015) ("Statements of a person as to his or her present friendliness, hostility, intent, knowledge, or other mental condition are admissible to prove such mental condition"). "The state-of-mind exception to the hearsay rule calls for admission of evidence of a murder victim's state of mind as proof of the defendant's motive to kill the victim when and only when there also is evidence that the defendant was aware of that state of mind at the time of the

crime and would be likely to respond to it."  Commonwealth v. Qualls, supra.

Here, there was evidence that the defendant was aware that the victim wanted to engage in a fight with him.  On the evening before the shooting, Rudolph and the defendant saw the victim waiting outside the entrance to the club, and Rudolph suggested that the defendant should go outside and fight the victim without weapons.  There was also evidence that the defendant responded to the possibility of a fight with the victim by killing him.  The Soares sisters testified that, immediately before the victim was shot, he had been yelling at a man across the street, and Rudolph testified that the defendant was that man.  There was no error in the judge's decision to allow this statement to be introduced to establish the defendant's motive to kill the victim.

7.  Ineffective assistance of counsel.  The defendant argues that his trial counsel's performance was constitutionally deficient in numerous respects.  He asserts that counsel was ineffective for, among other things, inadequate efforts to impeach Rudolph, failure to develop evidence of the crime scene, and failure to interview and call additional alibi witnesses.[13]

---

[13] The defendant also argues that he was denied the effective assistance of counsel because his trial counsel previously had represented Rudolph, and had a conflict of interest.  This claim is unavailing.  The defendant's trial

When addressing ineffective assistance of counsel claims, we "consider whether there was an error in the course of trial, and if so, whether such error was likely to have influenced the jury's conclusion." Commonwealth v. Freeman, 442 Mass. 779, 791 (2004). "A strategic decision by an attorney . . . constitutes error 'only if it was manifestly unreasonable when made.'" Commonwealth v. Jenkins, 458 Mass. 791, 804-805 (2011), quoting Commonwealth v. Coonan, 428 Mass. 823, 827 (1999). In considering ineffective assistance claims in a case of murder in the first degree, we review under the standard of a substantial likelihood of a miscarriage of justice, "as it is more favorable to the defendant." Commonwealth v. Freeman, supra. We conclude that none of the asserted failures shows any inadequacy in trial counsel's performance.

a. Impeachment of Rudolph. We apply "a stringent standard of review to claims of ineffective assistance because of failure to impeach a witness." Commonwealth v. Jenkins, supra at 805. The defendant claims that trial counsel failed to impeach Rudolph with his prior convictions. "[F]ailure to introduce the

_____

counsel represented Rudolph in 1988, in a case involving the malicious destruction of property. Rudolph received probation in that case; his term of probation ended in 1993. The motion judge found after an evidentiary hearing that counsel had no memory of having represented Rudolph, and the two cases, more than ten years apart, were not related. Furthermore, the judge found that the defendant's trial counsel "conducted a vigorous cross-examination of Rudolph," which was not impacted by his prior representation.

criminal record of a witness for impeachment purposes generally does not constitute ineffective assistance of counsel." Commonwealth v. Martinez, 437 Mass. 84, 93 (2002). Here, counsel testified at the hearing on the motion for a new trial that he made a strategic decision to focus on other methods of impeachment. His decision to do so was not manifestly unreasonable. Indeed, the motion judge found that counsel's cross-examination of Rudolph had been "vigorous" and effective.

The defendant claims also that trial counsel failed to impeach Rudolph with his recantations, prior to trial, of his identification of the defendant. In response to a motion in limine, however, the judge had ruled that if counsel impeached Rudolph with his recantations, Rudolph would be permitted to testify that the recantations were as a result of threats that he had received, including from the defendant's brother. See part 5, supra. Counsel's strategic decision to avoid this line of impeachment was not manifestly unreasonable.

The defendant argues that counsel should have impeached Rudolph with evidence that he was a heavy drug user in 2003. There was, however, no evidence that Rudolph had been using drugs on the night of the shooting. Counsel's decision to forgo this line of impeachment for other, more powerful grounds of impeachment was not manifestly unreasonable. Contrast Commonwealth v. Sena, 429 Mass. 590, 595 (1999), S.C., 441 Mass.

822 (2004).

   b.  <u>Introduction of crime scene evidence</u>.  The defendant claims that counsel was ineffective for failing to introduce evidence that would have proved conclusively that the shooting took place farther away from the intersection than where Rudolph testified it occurred.  Specifically, the defendant contends that trial counsel should have introduced photographs showing where the responding officers parked when they arrived at the scene, and should have argued that the location where the shell casings landed proves that the Honda was parked farther down the street from the intersection when the shooting occurred.  Throughout the trial, however, counsel effectively elicited testimony that the shooting occurred farther down the street, and not directly at the intersection.  In his closing argument, counsel also emphasized that Rudolph's testimony concerning the location of the shooting differed from the testimony of the other witnesses.  Counsel was not constitutionally ineffective for failing to introduce cumulative evidence concerning the location of the Honda that would have added little to support the defendant's vigorous attack on Rudolph's credibility as to the location of the vehicle at the time of the shooting.

   c.  <u>Additional alibi witnesses</u>.  The defendant argues that counsel was ineffective because he should have called additional alibi witnesses.  To establish ineffective assistance of counsel

33

based on a failure to call additional witnesses, a defendant "must show that the purported testimony would have been relevant or helpful." Commonwealth v. Ortega, 441 Mass. 170, 178 (2004). The defendant has not done so. Prior to trial, his investigator interviewed five potential alibi witnesses. Four did not have memories that would have been helpful, and the fifth was called to testify. In his motion for a new trial, the defendant submitted an affidavit from a potential alibi witness that stated that the witness ran into the club following the shooting and saw the defendant watching basketball on television. During the hearing on the motion for a new trial, however, that potential witness contradicted the statements in his affidavit.

The defendant also challenges numerous "other defense counsel failings." As did the motion judge, we conclude that trial counsel's conduct did not result in a substantial likelihood of a miscarriage of justice.

Relief under G. L. c. 278, § 33E. Having reviewed the entire record pursuant to our duty under G. L. c. 278, § 33E, we discern no reason to exercise our extraordinary power to reduce the degree of guilt or to grant a new trial.

Conclusion. The judgments of conviction on the indictments charging murder in the first degree and unlawful possession of a firearm are affirmed. The order denying the motion for a required finding of not guilty or, in the

alternative, for a new trial is also affirmed.

<u>So ordered</u>.