# United States Court of Appeals
## For the First Circuit

Nos. 20-1108
     20-1194

KYLE WATKINS,

Petitioner, Appellant,

v.

SEAN MEDEIROS, Superintendent,

Respondent, Appellee.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Allison D. Burroughs, U.S. District Judge]

Before

Barron, Chief Judge,
Lynch and Gelpí, Circuit Judges.

Janet Hetherwick Pumphrey for appellant.
Susanne Reardon, Assistant Attorney General, with whom Maura
Healey, Attorney General, was on brief, for appellee.

June 10, 2022

**LYNCH**, **Circuit Judge**.  Petitioner Kyle Watkins was convicted in Massachusetts state court on June 2, 2005 after a jury trial of first-degree murder for the shooting of Paul Coombs on April 26, 2003.  The Supreme Judicial Court ("SJC") affirmed his conviction.  Commonwealth v. Watkins, 41 N.E.3d 10, 28 (Mass. 2015).  His federal habeas petition was denied by the U.S. District Court.  Watkins v. Medeiros, No. 16-cv-10891, 2020 WL 68245, at *1 (D. Mass. Jan. 7, 2020).  Watkins timely appealed.

This case is unusual because the state courts made an error of fact in their decisions.  We hold that whether we are bound by the deferential standard of review under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214, or whether we engage in de novo review, the conclusion is the same.  Watkins has not shown prejudice arising from the error or with respect to any of the other claims he makes.  Nothing in the arguments presented in the habeas petition undermines our confidence in the jury's verdict of guilt.  Accordingly, we affirm the denial of habeas relief.

I.

A. Procedural History

Paul Coombs, who knew Watkins, was shot and killed at approximately 9:50 p.m. on April 26, 2003.  Watkins, petitioner here, was charged with the murder on September 25, 2003.  A jury trial was held in Bristol County Superior Court between May 24 and

June 2, 2005. The Commonwealth presented many witnesses. Vern Rudolph, a prosecution witness who identified Watkins as the shooter, knew both Watkins and Coombs. After the conviction, the state trial court sentenced Watkins to a term of life imprisonment.

On March 11, 2011, Watkins moved under Mass. R. Crim. P. 25(b)(2), as amended, 420 Mass. 1502 (1995), for the entry of a not guilty verdict or, in the alternative, a new trial under Mass. R. Crim. P. 30(b), as appearing in 435 Mass. 1501 (2001).[1] Watkins argued, among other things, that his trial counsel was ineffective for failing to introduce evidence that allegedly would have impeached Rudolph's credibility; and that the Commonwealth violated Brady v. Maryland, 373 U.S. 83 (1963), for withholding several other pieces of so-called impeachment evidence, the nondisclosure of which allegedly deprived Watkins's counsel of the opportunity to cross-examine Rudolph effectively. A four-day evidentiary hearing on the motion for a new trial was held in August 2012, after which the motion was denied. Watkins appealed the denial, together with his conviction, to the SJC, and the SJC

---

[1] Mass. R. Crim. P. 25(b)(2) provides that "[i]f a verdict of guilty is returned [by a jury], the judge may on motion [filed within five days of the verdict] set aside the verdict and order a new trial, or order the entry of a finding of not guilty" based on insufficiency of the evidence. Mass. R. Crim. P. 30(b) states that "[t]he trial judge upon motion in writing may grant a new trial at any time if it appears that justice may not have been done. Upon the motion the trial judge shall make such findings of fact as are necessary to resolve the defendant's allegations of error of law."

affirmed both on November 24, 2015. Watkins, 41 N.E.3d at 15. The SJC rejected the ineffective assistance of counsel claim, observing that trial counsel's cross-examination of Rudolph was "vigorous" and "effective." On the Brady issues, the SJC found the undisclosed evidence cumulative and/or of little probative value, so its nondisclosure caused Watkins no prejudice.

On May 16, 2016, Watkins filed in the U.S. District Court for the District of Massachusetts a petition for a writ of habeas corpus. He argued the SJC's decision, among other things, was contrary to and an unreasonable application of Brady and was based on an unreasonable determination of the facts.[2] The district court denied the petition on January 7, 2020, Watkins, 2020 WL 68245, at *1, and granted a certificate of appealability as to only the Brady claims on April 2, 2020. Before this court, Watkins has divided the alleged Brady violations into four categories:

- withheld exculpatory evidence of the only identification witness's (Vern Rudolph) extensive police contacts, cooperation, and lies even after the Court ordered the evidence to be produced;

---

[2] Watkins also brought before the district court claims of prosecutorial misconduct, ineffective assistance of counsel, and insufficiency of the evidence. Those claims are not now at issue, as the district court rejected them and both the district court and this court declined to extend the certificate of appealability ("COA") to them. See Miller-El v. Cockrell, 537 U.S. 322, 327 (2003) ("[A] prisoner seeking a COA need only demonstrate 'a substantial showing of the denial of a constitutional right.'" (quoting 28 U.S.C. § 2253(c)(2))).

- the crime scene diagram created by police which discredited the testimony of the only eyewitness;

- a trooper's exculpatory notes of the witness's pre-interview with the police prior to its tape recording; and

- evidence of the extensive rewards and inducements requested by and given to the witness in exchange for his testimony.

Watkins's first claim centers on a withheld police report from October 29, 2003 (the "finger-shot report") which was not disclosed to Watkins. The state courts' rejection of this Brady claim rested upon the factual error that the report did not show the investigating officers were aware that Rudolph was a witness against Watkins. Watkins, 41 N.E.3d at 22. We provide the text of the finger-shot report later, but this factual determination by the motion for a new trial judge (the "motion judge") and the SJC was clearly incorrect.

We hold, as the parties here agree, that the state courts made an error of fact. The parties disagree as to the effect of this error on this habeas petition and on the issue of deference to the SJC's Brady analysis.

B. Facts Presented at Trial

Save the state courts' erroneous conclusion that police were unaware at the time Rudolph shot his finger that he was a witness against Watkins, "[w]e describe the facts as they were found by the SJC, supplemented with other record facts consistent

- 5 -

with the SJC's findings." Healy v. Spencer, 453 F.3d 21, 22 (1st Cir. 2006). However, because of that error, we provide, as is necessary, the following lengthy description of the facts as presented at trial. We describe Rudolph's testimony as to his identification of Watkins and his cross-examination after describing the testimony of the other witnesses.

### i.   Events Leading Up to the Shooting

Watkins owned a blue Lincoln Mark VIII and frequented the Elks Lodge, a private club on Mill Street in New Bedford, Massachusetts.[3] Watkins, Coombs, and Rudolph were all at the Elks Lodge on April 25, 2003. Watkins, who was inside the Lodge, was heard loudly arguing on the phone with Coombs, who was seen outside the club "frisking" people who were attempting to enter. Rudolph, who was also inside the club at the time, suggested to Watkins that he should go outside and fight Coombs. Watkins declined and stayed inside the Elks Lodge until Coombs left for the night.

The jury heard the testimony of Coombs's then-girlfriend, Jessica Bronson, that the next morning, April 26, 2003,

---

[3]   Officer Brian Safioleas of the New Bedford Police testified he had seen Watkins driving a blue Lincoln Mark VIII prior to the evening of April 26, 2003; Erin Depina testified that she had registered a blue Lincoln Mark VIII in her name for Watkins and that the car belonged to him; and Paul Tomasik, the landlord of Watkins's girlfriend, testified that he had taken a picture the morning of April 26, 2003 of a Lincoln Mark VIII parked in the girlfriends' driveway.

Coombs told Bronson he wanted to "whoop [Watkins's] ass." That afternoon, Watkins returned to the Elks Lodge. The then-bartender testified that Watkins seemed upset and told the bartender he was "tired of people F'ing with him." Watkins went back to the Elks Lodge that evening, that time acting "tough" and saying to Rudolph that "[t]hings are going to change around here." John Gilbert, a doorman at the Elks Lodge in April 2003, testified that he saw Watkins leave the club sometime after 9:30 p.m., and after that, Gilbert saw police lights in the area. Gilbert stated that Watkins was wearing dark clothing that night.

Bronson testified that Coombs had called her at approximately 9:45 or 9:47 p.m. on April 26, to tell her he was on his way home. At the end of the call, Bronson heard Coombs shout to a third party, "Why don't you fight me now?" Bronson heard nothing from Coombs after that, and learned fifteen to twenty minutes later that Coombs had been shot.

The jury also heard the testimony of New Bedford Police Officer Bryan Safioleas, who was on duty from 3:30 to 11:30 p.m. on April 26, 2003. Officer Safioleas had been parked near the intersection of Mill and Cedar Streets -- just one block west of the Elks Lodge -- until approximately 9:40 p.m. that night.[4] He

_____

[4]    "Mill Street, on which the victim was standing at the time of the shooting, runs perpendicular to Cedar Street, which is a one-way street . . . .  There is a stop sign on Cedar Street at

testified that it was a "very rainy night." In the ten minutes before he left the area, he had observed a blue Lincoln Mark VIII drive past him "on a couple of occasions." Officer Safioleas testified that he had seen that vehicle prior to April 26 in the Elks Lodge parking lot with Watkins inside it. The jury would later hear further testimony that Watkins drove a blue Lincoln Mark VIII.

The officer testified that he began to head westbound down Mill Street at around 9:40 p.m. but he was quickly called back to his post at approximately 9:53 p.m. due to a call "for units to respond to Kempton and Cedar Street for reported shots fired."[5] The dispatch instructed Officer Safioleas to look for a "dark-colored Lincoln Mark VIII."[6]

### ii. The Shooting

We describe first the testimony of several witnesses other than Rudolph who were near the shooting when it happened. Beatriz and Ernestina Soares each testified that they were driving down Cedar Street towards Mill Street at about 9:48 p.m. on April

---

the intersection of the two streets." Watkins, 2020 WL 68245, at *2.

[5] Kempton Street runs parallel to Mill Street, just one block south.

[6] Officer Safioleas's police report noted that the subject car was a blue Lincoln Mark VII, not VIII, but the officer explained that he merely had made a typographical error.

- 8 -

26, 2003. As they approached the stop sign at the intersection, they saw a blue Lincoln Mark VIII parked on right side of Mill Street. Although the Lincoln had the right of way, it flashed its lights to tell the Soares sisters they could proceed. As the sisters turned left onto Mill Street, they saw two men arguing near a Honda Accord which was parked on the left side of Mill Street. They stated that one man was inside the Honda Accord and the other man was across the street on the sidewalk, closer to the blue Lincoln. The sisters both described the man near the Lincoln as approximately six feet tall, well-built and around 220 pounds, black, bald or having a receding hair line, and wearing dark clothing, including a hooded sweatshirt.

The sisters testified that they also overheard the man inside the Honda yelling at the other man: "Don't fuck [with] me. I'm not the one to be fucked with." Ernestina then saw the man by the Lincoln cross the street towards the Honda "and put up his arm." The sisters continued to drive, and when they were about a half-block away from the two men, Beatriz testified she heard between eight and twelve gunshots and Ernestina heard "[a]t least five." Beatriz called 911 to report the shooting, and she gave a description of the Lincoln Mark VIII she observed.

On cross-examination, defense counsel questioned Beatriz about the misty weather (which Beatriz could not recall); Beatriz's ambivalence as to whether the shooter was bald or had a receding

- 9 -

hairline; the statement of the victim that Beatriz overheard: "I'm not the one"; and a prior statement by Beatriz that the blue vehicle opposite the Honda may have been a Marquis, rather than a Mark VIII. The prosecutor on redirect played a portion of Beatriz's 911 call, which confirmed that Beatriz contemporaneously identified to the police that the blue car was a Mark VIII.[7] Defense counsel asked Ernestina only whether she heard the man by the Honda also yell "You don't know who I am." Ernestina could not recall.

The jury heard the testimony of Michael Couture, a resident of New Bedford who was driving through the intersection of Cedar and Mill Streets near the time of the shooting. He, too, had waited at the stop sign on Cedar Street because of the stopped blue vehicle on Mill Street that had the right of way. Once a white automobile started to swerve around the blue vehicle on Mill, Couture drove through the intersection. As Couture did, he heard a loud noise and saw a flash out of the corner of his eye. Couture looked up and saw the firing of several shots into a Honda by a man who "appeared . . . about six-foot to six-two, slim to medium build. [Couture] would say he looked like a black man . . . . He

---

[7] Beatriz had testified eight months after the shooting in another proceeding that the car may have been a Marquis; she clarified later in that proceeding that the car she observed was a Lincoln Mark VIII.

- 10 -

had dark clothes on." Couture proceeded to call 911 and wait for police to arrive at the scene.

Defense counsel asked Couture several questions on cross-examination. He first asked whether April 26 was a misty, rainy night, to which Couture responded "[i]t may have been overcast. I don't recollect." Couture explained that, despite the weather and although the incident "happened very rapidly," he still was able to see the shooter fire his gun with two hands and then "run across the field after the shooting." When cross-examined about his description of the shooter, Couture reiterated that the man he saw was around six feet tall, slender (around 175 pounds), possibly black, and wearing dark clothing. Couture also was questioned by the defense about where the white and blue vehicles went after the shooting. Couture testified that he lost sight of both after he crossed Mill Street because his attention was focused on the shooting.

Officer Safioleas was the first officer to arrive at the scene. He testified at trial that, there, he saw a green Honda Accord parked on the side of Mill Street, about eighty feet west of Cedar Street near where a memorial of the shooting now is located, with its brake lights on. As he approached the vehicle, he saw the operator slumped over at the wheel, bleeding and not conscious. The man had no pulse and was not breathing. He had holes in his jacket and five to seven wounds on his chest. The

man was identified as Paul Coombs. Coombs was declared dead at a local hospital.

### iii. Watkins's Arrest

Watkins was identified as a suspect early on in the police investigation into the shooting. Yet police were unable to locate Watkins for more than three months after the shooting. Many of Watkins's friends and acquaintances testified at trial that they likewise did not see him after April 26, 2003. Law enforcement officers testified that the Lincoln Mark VIII was found unattended in May 2003, and had been "wiped clean" of all fingerprints.

The trial testimony concerning Watkins's eventual arrest is as follows. On August 5, 2003, Officer Michael Smith and other law enforcement officers "observed a male matching the description of Kyle Watkins walk out of the area of 19 Lafayette Park" in Lynn, Massachusetts. The officers approached the male, identified themselves as police officers, and asked him for his name. The male responded that his name was Leland Brooks and produced a Texas driver's license in that name. The officers then asked the male for his date of birth, but the male could not remember the date. After further questioning, the man admitted he actually was Kyle Watkins. Watkins was placed under arrest at that time and taken to the Lynn Police Station.

Officer Leonard Baillargeon met Watkins at the police station. The officer, who knew Watkins, testified that Watkins "was unshaven. He was sweating. He was wearing a white tee shirt . . . that was soiled. He was wearing a pair of baggy blue jeans and white high top sneakers." Officer Baillargeon testified that "[h]e appeared to . . . have lost a lot of weight." The officer made a comment to Watkins about his weight loss, to which Watkins responded he "was down to 180 pounds. He had lost weight because he was under a lot of stress." When Officer Baillargeon transported Watkins back to New Bedford, Watkins remarked he was "enjoying the ride" because it was going to be "the last ride he was going to have for a long time."

Defense counsel cross-examined Officer Baillargeon on only one issue: Watkins's weight. The officer testified that Watkins previously weighed "[b]etween 200 and 220, maybe 225," the same weight estimated by the Soares sisters of the shooter on the night of the murder.

iv. <u>The Testimony of Vern Rudolph for the Prosecution</u>

Vern Rudolph was the Commonwealth's primary identification witness, although he was by no means the only prosecution witness against Watkins, and the other witnesses corroborated key parts of Rudolph's testimony. Before discussing the shooting, the prosecution first questioned Rudolph about his arrest on December 3, 2003 for selling cocaine in a school zone

and unlawfully possessing a firearm, his guilty plea and three-year prison sentence, and the benefit the prosecutor promised Rudolph in exchange for his testimony. Rudolph testified that he understood the prosecutor to promise in a letter that Rudolph would not have to serve the second half of his three-year sentence because he was testifying against Watkins. The letter, which was disclosed to defense counsel prior to trial and admitted by the prosecution as an exhibit, stated:

> Mr. Rudolph has been incarcerated since his arrest [on December 3, 2003]. On or about July 30, 2004 Mr. Rudolph pled guilty to offenses in the District Court [including count 6, distribution of cocaine within 1000 feet of a school] and received sentences to the house of correction totaling three years and one day . . . .
> As of June 2, 2005 Mr. Rudolph will have served 18 months of his sentence.
> I understand that you will file a motion for a new trial and to dismiss count 6 and a motion to re-sentence Mr. Rudolph . . . [and] that the remaining un-served portion of this sentence be suspended and he be placed on probation for three years with appropriate court imposed conditions of probation.
> The net effect of these motions, should they be allowed, will be to release Mr. Rudolph from further incarceration and place him under probation supervision for three years.

Rudolph then testified to what he saw on the evening of April 26. Rudolph stated, inter alia, that he was at the Elks Lodge at around 8:30 p.m. that evening and he saw Watkins there

wearing a black hoodie and black jeans,[8] and acting "tough." Rudolph told the jury that after Watkins had said to him that "[t]hings are going to change," Rudolph responded, "I don't have [a] disagreement with you. You have an agreement or disagreement with Paul, take that up with him." Rudolph testified he did not see Watkins at the Elks Lodge after that and did not know when Watkins left, but stated he himself left the club sometime around 9:30 p.m. to pick up his daughter.

Rudolph testified that he was driving down Mill Street in his white Nissan Maxima when he saw the Lincoln Mark VIII parked on the side of the road by Cedar Street. Rudolph stated that he slowly began to swerve around the Lincoln towards the intersection when he saw Kyle Watkins shooting at a Honda Accord. Rudolph then turned down Cedar Street and sped away. He admitted that "[i]t was a foggy night. It wasn't too bad. It was, you know -- it wasn't a good night. That's for sure."

Rudolph testified that, thereafter, he told his mother what he had witnessed,[9] and he spoke with police about the shooting

_____

[8] Rudolph later testified he was not "aware of the description that [the Soares sisters and Couture] had given of the person who fired the shots at the time [he] went to the police station."

[9] Just before Rudolph testified, the jury heard the testimony of his mother, Patricia Rose. She testified that at around 10:00 p.m. on April 26, Rudolph knocked on her door, walked into her house, and stated that "on the way to the mall to pick up his daughter, . . . he witnessed someone getting shot" and "he saw who did it." Thereafter, Rose drove to the location identified by

- 15 -

on April 30, 2003, testified before the grand jury on September 9, 2003, and testified at a deposition later in September 2003. His trial testimony was consistent with those prior statements and testimony.

> v. <u>Defense Strategy and Cross-Examination of Rudolph</u>

Watkins's primary defense strategy at trial was to attack the veracity of Rudolph's testimony, impeach Rudolph's credibility, and ultimately try to discredit Rudolph's identification of Watkins as the shooter. Indeed, defense counsel had highlighted during his closing argument that Rudolph had incentives to lie -- Rudolph and his brother initially were suspected of Coombs's murder and Rudolph was promised in exchange for his testimony an "agreement to get out of jail" for an unrelated offense. Defense counsel implied that Rudolph did in fact lie. Defense counsel questioned Rudolph's timeline, the visibility that night, and the location Rudolph placed the Honda at the time of the shooting, <u>i.e.</u>, near the intersection of Cedar and Mill Streets rather than on Mill Street eighty-or-so feet west of Cedar, which is where the memorial is and where the other witnesses and physical evidence placed the Honda.[10]

---

Rudolph as the scene of the shooting and saw "[t]hey were still working on the body." Rose was not cross-examined.

[10] Trial counsel also was aware of and chose not to introduce on cross-examination Rudolph's various pre-trial

- 16 -

Defense counsel engaged in an extensive cross-examination of Rudolph which covers more than twenty pages of the trial transcript. Defense counsel had the following exchanges with Rudolph, among others, in front of the jury:

> Q: The first shot that goes off, is that simultaneous with the person you identify as Kyle Watkins and they happen to go off?
>
> A: Just about, yes.
>
> Q: Could you agree with me, all of what you saw in terms of the shooting and the person simultaneously firing the shots occurred in a matter of two or three seconds?
>
> A: Fair to say, yes.
> . . . .
>
> Q: And April 26th, at least until April 30th, you hadn't told anybody that the person you saw shooting was Kyle Watkins; is that fair to say?
>
> A: Yes.
> . . . .
>
> Q: And the police -- you actually make a call to the police station [on April 30, 2003]?
>
> A: Yeah.
>
> Q: And that's because you had heard that they may be looking for your brother?

"recantations" of his identification of Watkins to Watkins's family and private investigator, discussed infra. The motion for new trial judge found that trial counsel had made a reasonable tactical decision "in order to prevent the Commonwealth from introducing evidence of . . . threats" to Rudolph, which were made by Watkins's family after Rudolph began cooperating. It is settled law in this case that these strategic tactical decisions by trial counsel did not constitute ineffective assistance of counsel.

- 17 -

A: Yes.

Q: And your brother is what, a suspect in this case?

A: Yes.

Q: When you get this call, you don't identify yourself.  This is April 30th, right?

A: I believe so.
. . . .

Q: When you make the call, it's because you hear that the police may be looking for your brother because he's a suspect in this shooting of Paul Coombs[?] . . .

A: Yes.

Q: So when you make this call, you don't identify yourself.  The conversation goes back and forth; is that correct?

A: Yes.

Q: And at some point in time your name comes up as a result of the conversation that you're having.  It's by police personnel, as a result of making that call, right?

A: Yes.
. . . .

Q: And it's at that point in time you then identify yourself?

A: Only after they say my name.

Q: That's when you identify yourself?

A: Yes.
. . . .

Q: And [you go to the police station for an interview and] at some point, the police say to you, "Well, if it's not you and it's not

your brother, then it must be Kyle Watkins,"
isn't that right?
. . . .

A: Somewhat, yeah.

Q: And words to the effect that if you don't
tell us that it's Kyle Watkins, you're going
to remain -- you and your brother are going to
remain the main suspects in this case.  That
come up?

A: Yeah.

Defense counsel also questioned Rudolph about what counsel characterized as inconsistencies in Rudolph's testimony. He cross-examined Rudolph about the time he left the Elks Lodge, as the shooting took place at around 9:50 p.m., just one block from the club.  Defense counsel implied that it would take minutes, not a third of an hour, for Rudolph to drive from the Elks Lodge to where the shooting took place.

Defense counsel asked Rudolph about where he placed the shooting, and how far from it he placed himself.  Rudolph stated he was on Mill Street, just east of the intersection of Cedar and Mill Streets, and the shooting took place by the Honda which was just a few feet west of the intersection.  Rudolph explained that, at the time of the shooting, the Honda was not as far down Mill Street as where the memorial is now.  Defense counsel observed that Rudolph's account "would lessen the distance of [Rudolph's] view from where [he was] . . . as opposed to the Honda being up near where the memorial is."  Officer Safioleas and Michael Couture

had testified that the memorial is located where the Honda was on April 26.[11]

Defense counsel then briefly cross-examined Rudolph about his "deal" with the Commonwealth, asking, "so now we're at the period that you're testifying here and the district attorney has made an agreement to let you out of jail; is that right? . . . For your testimony?" Rudolph responded in the affirmative. The court later instructed in its charge that the jury may "take into consideration the Commonwealth's agreement regarding a sentence currently being served by a witness in assessing his credibility. The testimony of such a witness should be scrutinized with particular care."

---

[11] Defense counsel highlighted other inconsistencies in Rudolph's testimony, including which hand Watkins fired his gun with:

> Q: What hand [did Watkins fire with]?
>
> A: Right hand.
>
> Q: Last time you talked to somebody, you told them it was the left hand, when you spoke to the police. Remember that? Or you don't remember that either?
> . . . .
>
> Q: You never told anybody that shooter was holding the gun with two hands; is that right? You never told anybody that?
>
> A: No.

Couture had testified that the shooter was using two hands.

After considering all of this evidence, the jury found Watkins guilty of murder.  Watkins argues the outcome could have been different had the Commonwealth produced additional evidence to impeach Rudolph, particularly the finger-shot report.

## II.

### A. Standard of Review

Our review of a district court's denial of a petition for habeas corpus is de novo.  Norton v. Spencer, 351 F.3d 1, 4 (1st Cir. 2003).  Our review of the SJC's decision is governed by AEDPA, and typically is "highly circumscribed" and must be "based solely on the state-court record."  Shinn v. Martinez Ramirez, No. 20-1009, 2022 U.S. LEXIS 2557, at *18–19 (S. Ct. May 23, 2022).

"The writ of habeas corpus is an extraordinary remedy that guards only against extreme malfunctions in the state criminal justice systems."  Id. at *17–18 (quotation marks omitted) (quoting Harrington v. Richter, 562 U.S. 86, 102 (2011)).  Under AEDPA, a federal court "shall not" grant habeas relief for a claim adjudicated on the merits in state court, unless the final state adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see Brown v. Davenport, 142 S. Ct. 1510, 1520, 1523 (2022). When there is no final state adjudication of the claim on the merits, our review of the SJC's decision is de novo. Healy, 453 F.3d at 25.

A prisoner "is never entitled to habeas relief." Shinn, 2022 U.S. LEXIS 2557, at *18. "[E]ven a petitioner who prevails under AEDPA must still today persuade a federal habeas court that 'law and justice require' relief." Brown, 142 S. Ct. at 1524 (quoting 28 U.S.C. § 2243). Thus, even when a state court "employ[s] faulty reasoning" in its decision, a petitioner cannot obtain habeas relief unless he also demonstrates that he "is in custody in violation of the Constitution or laws or treaties of the United States." Aspen v. Bissonnette, 480 F.3d 571, 576 (1st Cir. 2007) (second quoting 28 U.S.C. § 2254). Indeed, "habeas relief is available only if the petitioner demonstrates that 'Supreme Court precedent requires an outcome contrary to that reached by the relevant state court.'" Id. (quoting O'Brien v. Dubois, 145 F.3d 16, 24-25 (1st Cir. 1998), abrogated on other grounds by McCambridge v. Hall, 303 F.3d 24 (1st Cir. 2002) (en banc)). Watkins has not made such a demonstration in this case.

The relevant federal law here is the rule announced in Brady v. Maryland, where the Supreme Court stated: "[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt

or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87; see U.S. Const. amend. XIV. This court has stated that a habeas petitioner seeking to establish a Brady violation must demonstrate: "(1) the evidence at issue is favorable to him because it is exculpatory or impeaching; (2) the Government suppressed the evidence; and (3) prejudice ensued from the suppression (i.e., the suppressed evidence was material to guilt or punishment)." Conley v. United States, 415 F.3d 183, 188 (1st Cir. 2005). The nondisclosure of impeachment evidence is prejudicial only if there is a reasonable probability "that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." Id. (quoting Strickler v. Greene, 527 U.S. 263, 281 (1999)). The undisclosed evidence must "undermine[] confidence in the verdict." Id. (citing Kyles v. Whitley, 514 U.S. 419, 434 (1995)).

The strength of the impeachment evidence and the effect of its nondisclosure must be evaluated in the context of the entire record. Conley, 415 F.3d at 189 (citing United States v. Bagley, 473 U.S. 667, 683 (1985); United States v. Agurs, 427 U.S. 97, 112 (1976)). "Suppressed impeachment evidence, if cumulative of similar impeachment evidence used at trial (or available to the petitioner but not used) is superfluous and therefore has little, if any, probative value." Id.; see also United States v. González-González, 258 F.3d 16, 25 (1st Cir. 2001) (finding the

- 23 -

nondisclosure of impeachment evidence not prejudicial where the evidence was cumulative of similar disclosed impeachment evidence).

The SJC in this case determined that Watkins was not prejudiced by the Commonwealth's failure to produce several pieces of impeachment evidence. This determination was based, in part, on a factual error. Following oral argument, we asked the parties to address what standard of review applies in this habeas case to the SJC's prejudice determination under such circumstances. The government cited to Teti v. Bender, in which this court observed that AEDPA sets forth two different standards "which [both] apply to state court fact determinations" and "ha[ve] caused some confusion." 507 F.3d 50, 57 (1st Cir. 2007). Under 28 U.S.C. § 2254(d)(2), factual determinations are reviewed for reasonableness, and under § 2254(e)(1), factual findings are presumed to be correct. Teti, 507 F.3d at 57. In Teti, this court explained that "[t]he Supreme Court has suggested that § 2254(e)(1) applies to 'determinations of factual issues, rather than decisions,' while § 2254(d)(2) 'applies to the granting of habeas relief' itself." Id. (emphasis added) (citing Miller-El v. Cockrell, 537 U.S. 322, 341-42 (2003)). This court acknowledged, however, that neither it nor the Supreme Court has definitively resolved the question as to how these two provisions interact. Id. at 58; see also Brumfield v. Cain, 576 U.S. 305, 323 (2015)

- 24 -

(comparing when the Court required federal habeas courts to defer to state courts and when it reviewed habeas claims de novo). Further, it is not clear whether the presumption of correctness disappears only as to the precise factual error or whether it means that no portion of the factual determination by the state court is entitled to AEDPA deference. Out of an abundance of caution, we take the approach favorable to the petitioner of applying de novo review for all four categories of Watkins's Brady claim. We hold that Watkins has not satisfied his burden under Brady of showing the requisite prejudice.

### B. Failure to Disclose Finger-Shot Report and Error in the State Courts' Factual Determinations

We begin with Watkins's arguments concerning the failure to disclose the October 29, 2003 finger-shot report. It is clear the SJC made an erroneous factual determination when it stated that the report does not show the police knew, at the time, that Rudolph was a witness against Watkins. This error, on de novo review, cannot carry the day for Watkins.[12] The finger-shot was cumulative of other impeachment evidence introduced at trial. Further, the report -- a copy of which Watkins had at the state court motion for new trial hearing -- objectively would have harmed Watkins more than it helped him, and, in any event, Watkins put in

---

[12] We disagree with the dissent's reliance on what it says the SJC "did not dispute [or hold]." In addition, the dissent's line of reasoning is irrelevant, as we engage in de novo review.

no evidence at the post-trial motion hearing that competent counsel would, in fact, have used the information in the report, especially when viewed in its entirety.[13]  See Shinn, 2022 U.S. LEXIS 2557, at *17-19 (restricting federal habeas review to the state-court record).

The finger-shot report states:

Sir,
    The undersigned, while assigned to Unit #13C with Off.[ ]D.[ ]Amaral, was sent to 101 Page St. (St.[ ]Lukes Hospital) on a male that had been shot in the hand.
    Upon arrival we were directed to the victim identified as, [sic] VERNON RUDOLPH JR. (1/23/67).  RUDOLPH had the tip of the index finger on his right hand wrapped in a gauze bandage.  He removed the bandage and showed the undersigned what appeared to be a graze from a bullet on the outer tip of his finger near the fingernail.
    RUDOLPH stated that he has been receiving threats on his life since he became a witness in the murder investigation of one PAUL COOMBS.  RUDOLPH witnessed the murder by firearm and gave statements to the police implicating one KYLE WATKINS.  WATKINS was later apprehended and incarcerated.
    RUDOLPH originally stated that he parked his vehicle outside of the Elks Club at Cottage St. and Mill St. and was going to enter the club.  He claimed he saw a male wearing dark clothing approach and he became nervous. He tried to retreat to his car when this male produced a gun and pointed it at him.  A brief struggle then ensued and the gun fired once striking him in the finger.  RUDOLPH stated he then ran northerly on Cottage St. and the male suspect ran in the other direction.

---

[13]    To the extent the dissent argues that we are holding Watkins had to introduce expert testimony, that misreads our analysis.

- 26 -

After several minutes and more specific questioning he eventually admitted that he fabricated the story. He indicated that he had shot himself accidentally with a gun that belonged to a friend. He stated that he does not carry a gun and knows very little about them. He said that he did not know that the safety was off. RUDOLPH did not want to elaborate on where this took place and did not want to implicate his friend as it was not his fault.

RUDOLPH stated that he had hoped to be treated and released without the hospital having to contact the police. He apologized for creating the story and wasting our time, but he felt he had no choice. He stated that he has in fact been receiving threats from WATKINS' friends, but did not want to name anyone or document any of the incidents.

A nurse explained that stitches were not required and that the wound would heal on its own. RUDOLPH was then given Percocet for pain and released from hospital care.

(emphasis added).

Watkins argues in his federal habeas case that the use of the report would permit a jury to draw the inference that Rudolph had received another, undisclosed benefit from the Commonwealth because he was not prosecuted for unlawful possession of a firearm or lying to a police officer. He also argues that the report shows a pattern of Rudolph implicating Watkins and seeking rewards for his testimony against Watkins, and that Watkins was unable to show this pattern at trial. Neither argument satisfies his burden to show prejudice under Brady.

The failure to produce the report was not prejudicial because it was cumulative, even if the inference attempted to be

- 27 -

drawn was plausible. The record does not show such an inference is plausible. Moreover, there was far stronger evidence produced and introduced at trial of an actual, considerable benefit Rudolph was promised to receive from the Commonwealth in exchange for his testimony: a letter showing the prosecutor promised that he would ask that Rudolph's term of imprisonment for the more serious criminal law violation of drug distribution near a school zone (in addition to unlawful possession) to be reduced in half and for Rudolph to be released from prison. Defense counsel in fact effectively used, and the jury had a copy of, this letter at trial, which defense counsel called "an agreement to get out of jail."

Furthermore, the purported inference of an undisclosed deal on which Watkins's argument rests is not supported by the record. Watkins has provided no evidence that Rudolph and the Commonwealth discussed any deal concerning the finger-shot incident, nor that his testimony against Watkins had any bearing on the Commonwealth's decision not to prosecute him. That police wrote an incident report about a shooting for which they were called, without more, is insufficient to permit the inference that the Commonwealth would have charged Rudolph absent his testimony in this case. As the report shows, Rudolph already had given his statement to police about Coombs's murder before this incident. Further, any inference of a deal was refuted, as Rudolph testified at the motion for new trial hearing that he had no deal with the

Commonwealth regarding the finger-shot incident and the prosecutor testified at that hearing that he had no recollection of any such deal.

Watkins also argues, and the dissent adopts the argument, that Watkins was deprived of an opportunity to cross-examine Rudolph about a purported tendency to "fabricate[] stories involving" Watkins to protect himself. But there was no such deprivation of opportunity. At trial, defense counsel engaged in the following cross-examination of Rudolph:

> Q: And the police -- you actually make a call to the police station [on April 30, 2003]?
>
> A: Yeah.
>
> Q: And that's because you had heard that they may be looking for your brother?
>
> A: Yes.
>
> Q: And your brother is what, a suspect in this case [for Coombs's murder]?
>
> A: Yes.

Defense counsel also cross-examined Rudolph about the fact that Rudolph did not go to the police station until after he learned that he himself was named a suspect, and that, during that initial police interview, he was asked: "Well, if it's not you and it's not your brother, then it must be Kyle Watkins[?]" This and other impeachment evidence amply, as argued by defense counsel repeatedly, permitted the jury to draw the inference that Rudolph

implicated Watkins in order to exonerate himself and his brother and, so, Rudolph was not credible.[14]

Watkins's argument to us of prejudice does not take into account the risks to him of his opening the door to the introduction of the finger-shot report. Further, Watkins failed to introduce testimony at the motion for new trial hearing in the state court that competent trial counsel, or indeed his own trial counsel, would have chosen to use the report. In fact, as to his habeas argument based on a theory of Rudolph recanting, the finger-shot report objectively is weaker than other evidence which his trial counsel had as a matter of trial strategy chosen not to use.[15] Defense counsel had evidence that Rudolph had earlier "recanted" his identification of Watkins to Watkins's family, friends, attorney, and private investigator, although Watkins does

---

[14] The dissent argues that the nondisclosure of the finger-shot report was prejudicial because the report shows Rudolph would have been "especially" willing to implicate Watkins to protect himself because that implication "would spare [Rudolph] from being subjected to a new felony conviction and yet more time in prison than he already knew that he might have to serve[.]" In addition to being cumulative, this argument ignores the timing of the relevant events. At the time of the finger-shot incident, Rudolph did not know that he later would be incarcerated. In fact, no charges were pending against him at the time; Rudolph was not arrested on the drug distribution charge until December 3, 2003, and he did not plead guilty to that charge until July 30, 2004.

[15] We take an objective view of what competent counsel would do, and this view happens to be the same realistic view as the one trial counsel in fact took in weighing whether the benefits of using so-called impeachment evidence, cumulative at best, outweighed the considerable costs of using it.

not point to any instance in which Rudolph recanted his identification to the police. The evidence that Watkins's counsel had and chose not to use included Rudolph's statement to the private investigator that he "couldn't really identify the shooter," and his comment to Watkins's brother, basically, to "[t]ell Kyle he has nothing to worry about. The [police] . . . tripped me up, I didn't see anything, nobody could see anything. Tell Kyle he has nothing to worry about."

Watkins's trial counsel testified at the motion for new trial hearing as to why he chose not to use this evidence of Rudolph "recanting" his identification of Watkins. Counsel stated that "if the[ recantations] were brought in, then the government could bring in evidence of any threats" made against Rudolph, which are thought to have been made after Rudolph spoke with the police and before he "recanted" privately to those associated with Watkins. The motion for new trial judge held that trial counsel's tactical decision was reasonable, and the SJC affirmed. Watkins, 41 N.E.3d at 26-27. The district court agreed, conclusively ruling that "[t]he decision to forego [this] line of questioning in order to prevent the Commonwealth from introducing potentially damaging evidence was 'clearly a tactical decision that "falls within the wide range of reasonable professional assistance[.]"'" Watkins, 2020 WL 68245, at *14 (quoting Cohen v. United States, 996 F. Supp. 110, 116 (D. Mass. 1998)). We do not revisit the ruling, as any

ineffective assistance of counsel claim is outside the scope of the COA. See Blue v. Medeiros, 913 F.3d 1, 5 n.9 (1st Cir. 2019) (stating the general rule that, in a habeas proceeding, this court should not consider the merits of an issue unless a COA has been obtained for that issue).

Rudolph had testified at his pre-trial deposition that Watkins's cousin had threatened Rudolph after he spoke to the police. According to Rudolph, Watkins's cousin threatened that if Rudolph testified against Watkins, Rudolph would be "assassinate[d]."

The undisclosed finger-shot report similarly shows that Rudolph identified Watkins to the police and that he was afraid of Watkins and felt threatened by Watkins's friends and family in the aftermath. Objectively, competent defense counsel would not have chosen to introduce the finger-shot report to the jury, just as defense counsel chose not to introduce the private recantation evidence, which the state courts have held was a permissible tactical decision.

Further, Rudolph did not recant his identification of Watkins to the police and, if anything, the October 29, 2003 finger-shot report cannot be prejudicial because it reinforced Rudolph's identification. Rudolph told police during the finger-shot incident that he was a witness against Watkins, and the version of events Rudolph gave to law enforcement before and after

the incident was the same. On April 30, 2003, Rudolph called the police and informed them that he had witnessed Watkins shoot Coombs; on September 9, 2003, he testified before the grand jury to what he saw; later in September, he testified at a deposition to the same; as did he in 2005 at Watkins's trial. The finger-shot incident took place weeks after Rudolph already essentially had committed to being a witness against Watkins, and his testimony did not change after that.

For all these reasons, the impeachment evidence in the finger-shot report presents no new tool to attack Rudolph's testimony. Cf. United States v. Flores-Rivera ("Flores I"), 787 F.3d 1, 19 (1st Cir. 2015), overruled by statute on other grounds as stated in United States v. Smith, 954 F.3d 446, 448 (1st Cir. 2020).

The dissent's reliance on Flores I, 787 F.3d 1, and Flores-Rivera v. United States ("Flores II"), 16 F.4th 963 (1st Cir. 2021) is misplaced, as the facts and circumstances are dissimilar to the instant appeal. In those cases, the defendants' primary trial strategy was to impeach the three main witnesses against them "by suggesting [the witnesses] engaged in a coordinated effort to fabricate their testimony." Flores I, 787 F.3d at 10; Flores II, 16 F.4th at 965 ("Our opinion in Flores I describes at length the relevant factual background for this collateral appeal."). The witnesses' testimony had been "both

essential to the convictions and uncorroborated by any significant independent evidence." Flores I, 787 F.3d at 18. All three witnesses at trial "flatly and firmly denied discussing anything involving the . . . case" prior to testifying. Id. at 10. In Flores I, it was discovered after trial that the government had failed to disclose, among other things, notes which showed that the witnesses had, in fact, discussed their testimonies beforehand. Id. at 18. This nondisclosure (when combined with other undisclosed evidence) violated Brady because the prosecution "pivoted entirely on the credibility of [the witnesses]" and "there was no other document or recording tending to prove that the witnesses were lying when they denied discussing their testimony with one another." Id. at 19-20. This case, by contrast, is not one of a sole witness to whom there was no impeachment evidence introduced at trial. Rather, there was testimony and evidence that corroborated key parts of Rudolph's testimony -- e.g., the tension between Watkins and Coombs, the subsequent murder of Coombs, the shooter's physical appearance and vehicle, the victim's vehicle, the time of the shooting, and the general location of the shooting.[16] And, as just described, evidence of Rudolph's potential bias was covered extensively at trial.

---

[16] This corroboration of Rudolph's narrative of Coombs's murder is much greater than the single video of alleged drug trafficking transaction introduced in Flores II showing the

## C. Rudolph's Dangerousness Hearing To Determine Whether He Should Be Released

In December 2003, Rudolph was arrested for and charged with distributing cocaine to a police informant in a school zone and unlawfully possessing a firearm. Rudolph initially was held without bail pursuant to Mass. Gen. Laws ch. 276, § 58A, which at the time permitted the Commonwealth to move "for an order of pretrial detention" based on dangerousness, for any felony "that, by its nature, involves a substantial risk that physical force against the person of another may result." Rudolph petitioned for bail, and a dangerousness hearing was held before the Bristol County Superior Court on December 10, 2003. Rudolph stated at the hearing that his gun possession was for protection, in response to threats he was receiving for his cooperation in Coombs's murder investigation: "I'm not a dangerous person. I'm not. I'm just worried about my well-being. You can't bring a rock to a gun fight. . . . They're making threats against my life." The superior court judge denied Rudolph's petition and ordered him detained. In response, Rudolph stated: "So, now what happens when the murder case comes up? Am I to come to court bright eyed and bushy tailed and testify against somebody else after this? That's not fair, your Honor. It's not fair."

---

defendant "hand something to someone and receive something in return." 16 F.4th at 968-69.

Watkins argues the Commonwealth was required under <u>Brady</u> to produce the statement Rudolph made at the end of his dangerousness hearing, but this argument also falls short. On de novo review, we conclude this statement does not support the inference Watkins wants to draw from it, <u>i.e.</u>, that "Watkins was denied the opportunity to cross-examine Rudolph on bias." Further, there was at trial extensive examination of bias, and the failure to add onto any such evidence hardly would be prejudicial. Rudolph's motivation for reaching out to the police and the agreement that Rudolph later reached with the Commonwealth were discussed at trial and clearly informed Watkins and the jury that Rudolph sought an incentive in return for his cooperation and testimony. Rudolph's statements at his dangerousness hearing, as with his "recantations" and the finger-shot report, also show that Rudolph was threatened for testifying by Watkins's family and friends, and therefore would present substantial risks to Watkins if introduced at trial.

### D. The Crime Scene Diagram

Watkins's contention that the Commonwealth's failure to produce a hand-drawn crime scene diagram detailing the distance between the Honda Accord and shell casings found near the vehicle violated <u>Brady</u> similarly is unpersuasive. The diagram depicts the Honda Accord part-way down the block from the intersection of Mill and Cedar Streets, which differs from Rudolph's testimony that the

shooting occurred near the intersection. The Commonwealth's failure to produce this diagram was not prejudicial, as its impeachment of Rudolph's testimony, at most, would have been cumulative of the other evidence introduced at trial. Watkins highlighted all the purported discrepancies in Rudolph's testimony to the jury, including his placement of the Honda near the intersection, and the jury found Watkins guilty nonetheless.

Officer Safioleas testified, contrary to Rudolph's testimony, that the Honda was located near the memorial, which has been placed approximately eighty feet west of the Cedar and Mill Streets' intersection. This location corresponds generally to the location of the Honda as shown in the diagram. Mr. Couture similarly placed the Honda near the memorial. So, too, did photographs taken of the scene the night of the shooting, which were admitted as exhibits. Defense counsel argued this point to the jury in closing. The crime scene diagram, which is a rough, hand-written sketch that is not drawn to scale, would have a nominal effect on impeaching Rudolph, if any at all.

### E. Undisclosed Pre-Interview Notes

Watkins's challenge under Brady to the Commonwealth's failure to disclose the handwritten notes taken by Trooper Kilnapp fails. After calling the police on April 30, 2003 to report the shooting, Rudolph drove himself and his brother to the station for an in-person interview. At the station, Rudolph spoke with law

enforcement for approximately two hours before the police began recording his interview (the "pre-interview"). Trooper Kilnapp apparently took handwritten notes of the pre-interview which were not disclosed before trial because "they were not discovered until after the trial."

Watkins argues these notes, if introduced at trial, would have permitted the inference that the perpetrator was not Watkins, but a third party: Barry Souto.[17] The strands of the argument are simply not supported by the record. Watkins first contends that the notes show Rudolph did not implicate Watkins as the shooter until the recorded interview, when police threatened

---

[17] Watkins further argues the nondisclosure of these notes deprived him of the ability to cross-examine Rudolph on the discrepancies in his timeline, namely, when he left the Elks Lodge, because the notes indicate he left "at least after 9:15, could have been later. Maybe 9:30." This argument is belied by the record, which clearly shows defense counsel did cross-examine Rudolph about such discrepancies:

> Q: Now, can you tell us whether it was closer to 8:00 or 8:30 that you went into the [Lodge]?
>
> A: I would say about 8:30, 8:35 -- 8:30, yeah.
>
> Q: If you were in there for twenty minutes, then you're out of there about five past nine?
>
> A: Times, like I said, it's two years gone by.
>
> . . . .
>
> Q: And once you made -- if you came out of there at 9:30, is it fair to say that would be less than a minute for you to get to the point where the blue or black car was on Mill Street?

to charge him instead. The record says otherwise. The record shows that Rudolph named Watkins as the shooter when he first called the police, before heading to the station for an interview. The notes of this phone call, taken by Officer Oliveira, specifically state that Rudolph told police: "he observed KYLE WATKINS shooting a firearm into the Honda Accord parked on Mill Street just west of Cedar Street."

Trooper Kilnapp's notes also do not implicate Barry Souto as a third-party suspect. The notes first state: "Friday 4/25 @ Elks . . . Kyle Watkins in bathroom arguing w/ Paul Coombs on cell phone." They then state: "Barry [Souto] told Vern it was behind him re: Zach (few weeks ago) . . . Barry talked to Paul -- to clear it up. Barry told Vern he didn't hire hitman. Barry scared of Paul Coombs." Barry is the brother of Zachary Souto; Zachary was killed by Coombs several years prior, and Coombs was killed on Zachary's birthday. These notes do not support Watkins's theory that Barry killed Coombs out of revenge. Quite the opposite. The only plausible inference that can be drawn from the notes is that Barry had no intention of killing Coombs. Watkins has pointed to no evidence otherwise connecting Barry to the crime. He suffered no prejudice from the Commonwealth's failure to disclose.

## F. Rudolph's Promise From the Commonwealth

Watkins's argument concerning the alleged incompleteness of the Commonwealth's disclosures of its promise to Rudolph lacks merit.[18]  The record refutes Watkins's argument that the Commonwealth concealed the true nature of this promise.  The prosecutor sent a copy of the letter setting forth the promise to Watkins prior to the start of trial and entered the letter into evidence.  The letter clearly provided that Rudolph would be released from prison if he testified against Watkins, which he did.  Contrary to Watkins's argument, the letter states, inter alia, that Rudolph's attorney intended to move to dismiss the distribution in a school zone charge and for resentencing and Rudolph's immediate release, and the prosecutor in Watkins's case intended to ask Rudolph's sentencing judge to allow the motions if Rudolph testified truthfully against Watkins.  In light of this disclosed promise, the trial judge specifically instructed the jury to "scrutinize[] [Rudolph's testimony] with particular care."

---

[18]  Watkins's additional argument that the Commonwealth failed to produce other requested evidence of Rudolph's cooperation is unsupported by the record.  The trial court had ordered the government to file ex parte information concerning Rudolph's cooperation, and on March 31, 2005, the Commonwealth submitted a letter from Detective Lieutenant Scott Sylvia of the New Bedford Police Department listing the docket numbers of the cases in which Rudolph was involved.  The letter also stated that Rudolph was a victim or witness in several prior cases, but he did not act as an informant.  Watkins has pointed to no evidence to the contrary.

That the letter did not state that Rudolph would be released the same day of his testimony is immaterial.

                              III.

Even had Watkins overcome the obstacles to habeas relief (he has not), he still has not persuaded us that "law and justice" require the petition to be granted.  Shinn, 2022 U.S. LEXIS 2557, at *18 (quoting Brown, 142 S. Ct. at 1524).  The judgment of the district court denying habeas relief is affirmed.

**- DISSENTING OPINION FOLLOWS -**

**BARRON, Chief Judge, dissenting.** Kyle Watkins seeks to overturn his Massachusetts-law conviction for first-degree murder pursuant to his federal constitutional right to due process under Brady v. Maryland, 373 U.S. 83 (1963). He contends that he was convicted in violation of this right because the prosecution failed to provide his counsel with exculpatory evidence in advance of the trial that would have been material to his defense. Among that evidence is a police report that Watkins contends would have significantly aided his efforts to impeach what turned out to be the state's key witness against him. It is this aspect of Watkins's Brady challenge that is my focus.

The majority does not dispute that the police report constitutes exculpatory evidence. It nonetheless holds that Watkins's federal habeas petition must be denied because Watkins has not shown the prejudice under Brady that is required to establish that the police report was "material." See Brady, 373 U.S. at 87 ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."); Zuluaga v. Spencer, 585 F.3d 27, 30 (1st Cir. 2009) ("To prevail on a federal Brady claim, 'a habeas petitioner must demonstrate: . . . [that] prejudice ensued from the suppression (i.e., the suppressed evidence was material to guilt or punishment).'"

- 42 -

(quoting Conley v. United States, 415 F.3d 183, 188 (1st Cir. 2005))).

The Supreme Judicial Court of Massachusetts ("SJC") reached the same result in rejecting Watkins's Brady challenge on direct review. Commonwealth v. Watkins, 41 N.E.3d 10, 20-23 (Mass. 2015). But, although a federal court reviewing a habeas petition ordinarily must defer to such a state court ruling, see, e.g., Teti v. Bender, 507 F.3d 50, 55 (1st Cir. 2007), we need not do so here, because, as I will explain, the SJC's ruling rests on a clear mistake of fact. See 28 U.S.C. § 2254(d)(2). Moreover, as I will also explain, a de novo review of the record leads me to conclude that Watkins has shown the prejudice from having been denied access to the police report that Brady requires him to show. Accordingly, I conclude that Watkins is entitled to federal habeas relief on the ground that he was convicted of murder in violation of his federal constitutional right to due process under Brady. See Brown v. Davenport, 142 S. Ct. 1510, 1517 (2022) ("When a state court has ruled on the merits of a state prisoner's claim, a federal court cannot grant relief without first applying both the test this Court outlined in Brecht [v. Abrahamson, 507 U.S. 619 (1993)] and the one Congress prescribed in [the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA)]."); Kyles v. Whitley, 514 U.S. 419, 436 (1995) (explaining that a showing of prejudice that

satisfies Brady "cannot subsequently be found harmless under Brecht").

## I.

The key question at trial concerned who pulled the trigger in the murder of Paul Coombs in New Bedford, Massachusetts on the night of April 26, 2003. Watkins, 41 N.E.3d at 15. Some of the witnesses for the state who testified at the trial had driven past the site of the shooting either as it happened or immediately beforehand. Id. at 16. But, only one of them -- Vernon Rudolph -- claimed both to have been able to see the person shooting Coombs on the night in question and to have been able to identify that person as Watkins. See id. at 16-17.

In other words, Rudolph was no ordinary witness for the prosecution. He was the crucial one. He was also an acquaintance of Watkins, which meant that Rudolph knew what Watkins looked like. Id. That fact no doubt lent credibility to Rudolph's testimony that he saw Watkins pull the trigger.

At the same time, Rudolph was vulnerable to impeachment. The jury was informed both that he was incarcerated for unrelated felonies at the time that he was testifying against Watkins and that he had agreed to testify against Watkins in return for a prosecutor's promise to ask the judge who had sentenced him to a three-year-and-one-day term of imprisonment for his convictions to grant his motions for release from prison 18 months early. Id. at

- 44 -

21.  The record also shows that Watkins knew at the time of trial both that Rudolph had gone to the police station for an interview about the murder of Coombs only after having learned that Rudolph and Rudolph's brother were themselves suspects in that murder and that Rudolph had recanted to Watkins's private investigator prior to the trial the account that Rudolph then gave against Watkins at the trial.

But, as strong as Watkins's grounds for impeaching Rudolph's trial testimony were, Watkins contends that they would have been even stronger if he had known at the time of trial some other things about Rudolph that he did not know but that the prosecution did.  Most especially, Watkins did not know -- as the prosecution did -- about a police report that described an encounter that Rudolph had with the police prior to Watkins's trial.

The police report shows that on October 29, 2003, officers from the New Bedford Police Department were dispatched to a hospital to investigate a man who had been hospitalized for a bullet wound.  The officers were directed to the victim, whom they identified as Rudolph and whose finger had been grazed by a bullet.

According to the report, "RUDOLPH stated that he has been receiving threats on his life since he became a witness in the murder investigation of one PAUL COOMBS.  RUDOLPH witnessed the murder by firearm and gave statements to the police implicating

one KYLE WATKINS." The report next explains that "RUDOLPH

originally stated that," while he was outside of the Elks Club,

> he saw a male wearing dark clothing approach
> and he became nervous. He tried to retreat to
> his car when this male produced a gun and
> pointed it at him. A brief struggle ensued
> and the gun fired once striking him in the
> finger. RUDOLPH stated he then ran
> northerly . . . and the male suspect ran in
> the other direction.

But, according to the report, the story Rudolph told the officers

quickly changed:

> After several minutes and more specific
> questioning he eventually admitted that he
> fabricated the story. He indicated that he
> had shot himself accidentally with a gun that
> belonged to a friend. He stated that he does
> not carry a gun and knows very little about
> them. He said that he did not know that the
> safety was off. RUDOLPH did not want to
> elaborate on where this took place and did not
> want to implicate his friend as it was not his
> fault.
>
> RUDOLPH stated that he had hoped to be treated
> and released without the hospital having to
> contact the police. He apologized for
> creating the story and wasting our time, but
> he felt he had no choice. He stated that he
> has in fact been receiving threats from
> WATKINS' friends, but did not want to name
> anyone or document any of the incidents.

**II.**

Watkins relied in part on the prosecution's failure to

turn over the police report to him prior to trial in pressing his

Brady challenge to his murder conviction to the SJC. But, the SJC

determined that the police report did not itself show that "Rudolph

avoided any charges because he told police that he was the key witness in the Commonwealth's case against [Watkins]," and, on that basis, it ruled that Watkins's Brady challenge was without merit insofar as that challenge was premised on the withholding of the police report because Watkins had failed to show that the withholding of that report prejudiced him. Watkins, 41 N.E.3d at 22.

As I have noted, in reviewing a federal habeas petition that seeks to overturn a state law conviction, we ordinarily must give substantial deference to the state court ruling that affirms the conviction. But, that is not so when the state court ruling is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2) (emphasis added); see Harris v. Sharp, 941 F.3d 962, 978 & n.12, 987 (10th Cir. 2019) (determining that a state court's decision on the prejudice prong of an ineffective assistance of counsel argument "was based on an unreasonable factual determination," reviewing the claim de novo, and remanding for an evidentiary hearing on disputed facts). And, here, the SJC's ruling is "based on" a factual error of that kind.

Indeed, the state does not dispute that the SJC made an "unreasonable determination of the facts" in addressing the portion of Watkins's Brady claim that concerns the withholding of the police report. The SJC stated in that regard that the judge

at Watkins's motion-for-a-new-trial hearing found that "there was no evidence that investigating officers" to whom Rudolph confessed to having shot himself in the finger "were aware that Rudolph was a Commonwealth witness," and the SJC concluded that "[t]he record supports the judge's findings." Watkins, 41 N.E.3d at 22. But, the third paragraph of the police report's one-page narrative recounts that, after the police encountered Rudolph at the hospital, "RUDOLPH stated that he has been receiving threats on his life since he became a witness in the murder investigation of one PAUL COOMBS. RUDOLPH witnessed the murder by firearm and gave statements to the police implicating one KYLE WATKINS." (emphasis added). Thus, the state -- admirably -- concedes that the record "directly contradict[s]" the SJC's statement about what the record shows regarding whether the police officers who investigated Rudolph's injury "were aware that [he] was a Commonwealth witness," Watkins, 41 N.E.3d at 22.

To be sure, things are not quite so straightforward when it comes to the question of whether the SJC's ruling rejecting Watkins's Brady challenge is "based on" this unreasonable factual determination about what the police report shows. As to that question, the state asserts that the SJC's ruling is not so "based" because "the incorrect fact was just one of three reasons on which the SJC relied" in finding that no prejudice flowed from the prosecution's failure to disclose the police report.

- 48 -

The SJC's opinion, however, refutes any such notion. The opinion states in relevant part:

> The judge [presiding over the hearing concerning Watkins's motion for a new trial] found, however, that there was no evidence that investigating officers were aware that Rudolph was a Commonwealth witness, no evidence that he either sought or received favorable treatment in that matter, and that his anticipated testimony had no bearing on the decision not to prosecute Rudolph for "shooting himself." The record supports the judge's findings. The defendant therefore suffered no prejudice as a result of the Commonwealth's failure to disclose this police report.

Id.

In using the words "therefore suffered no prejudice" only after having listed three distinct features of the police report, id. (emphasis added), the SJC in no way suggested that its no-prejudice ruling depended on the police report having fewer than all three of those features. So, taking the SJC at its word, I conclude that the SJC necessarily rested its no-prejudice ruling on a feature of the police report that, as we have seen, the SJC unreasonably determined existed even though it does not.

The majority does not, in the end, disagree with me on this point. It rests its judgment that the portion of Watkins's Brady claim that concerns the withholding of the police report provides no basis for granting his habeas petition solely on the way that it resolves the next question that I will take up, which concerns whether the record, on de novo review, supports Watkins's

contention that he met his burden to show that the withholding of the police report caused him the prejudice that Brady requires him to show.[19]

## III.

To make the required showing of prejudice under Brady, Watkins must demonstrate that "a reasonable probability exists 'that the result of the trial would have been different if the suppressed [evidence] had been disclosed to the defense.'" Conley, 415 F.3d at 188 (quoting Strickler v. Greene, 527 U.S. 263, 289 (1999)). That does not mean that Watkins must prove that the trial certainly would have come out in his favor if he had been given access to the exculpatory evidence that was withheld from him. It means that he must show only that "the Government's evidentiary suppression undermines confidence in the verdict." Id. (citing Kyles, 514 U.S. at 434). The majority concludes, however, that Watkins has failed to make even that showing.

---

[19] I note, additionally, that undertaking de novo review under these circumstances is not inconsistent with this Court's past application of § 2254(d)(1) deference to a mixed question of law and fact. See Teti, 507 F.3d at 57; cf. also Conley, 415 F.3d at 188 n.3. While Teti's analysis focused on whether the state court had "unreasonabl[y] appl[ied] . . . clearly established [f]ederal law," 507 F.3d at 57 (citation omitted), the petitioner in that case had not refuted the state court's factual findings and so the question on appeal was whether the legal conclusion that flowed from those facts was unreasonable, id. at 60–63. By contrast, in Watkins's case, the SJC has not in fact made a determination concerning prejudice that is not based on the clear factual error that it made about the police report.

The majority rests that conclusion in part on the fact that the record shows that Watkins knew before trial that Rudolph had received a benefit in exchange for his testimony through Rudolph's deal with the Commonwealth, in which the Commonwealth had promised to advocate for Rudolph's early release from the prison sentence that he was then serving for having been convicted of dealing drugs in a school zone and unlawfully possessing a firearm. Relatedly, the majority points out that the record shows that Watkins also had other evidence available to him before trial from which a juror could draw the possible "inference that Rudolph implicated Watkins" in Coombs's murder "in order to exonerate himself and his brother" from suspicion for that same crime. Maj. Op. at 29-30.

In my view, however, the majority fails in highlighting those features of the record to grapple adequately with two ways in which the police report would have materially augmented Watkins's effort to impeach Rudolph, the crucial witness against him, notwithstanding the impeachment evidence that Watkins already had in hand by the time of the trial. See United States v. Flores-Rivera (Flores I), 787 F.3d 1, 19 (1st Cir. 2015) ("[T]he fact that the defense had some tools to attack [a star witness's] testimony hardly dismisses the potential of different tools as merely cumulative."), superseded by statute on other grounds as stated in United States v. Smith, 954 F.3d 446, 448 (1st Cir.

2020).  I thus cannot subscribe to the majority's conclusion that, because of the aspects of the record that the majority emphasizes, Watkins has failed to show the requisite prejudice.

First, the police report is material to Watkins's effort to impeach Rudolph, notwithstanding the evidence that Watkins did have on hand at the time of trial, because that report provides a basis for inferring the existence of a tacit "deal" between Rudolph and law enforcement regarding Rudolph's testimony against Watkins at trial that pertained to the confession that Rudolph made regarding the finger-shooting incident that was not otherwise known to Watkins.  For, while the majority is right that Watkins knew before trial about the actual deal between Rudolph and law enforcement regarding Rudolph's testimony against Watkins at trial that could help spare Rudolph from having to serve some prison time for the crimes for which he had already been convicted and sentenced, this unknown tacit deal would have helped Rudolph in a very different way, by ensuring that he would not have to go back to prison <u>after</u> he had served his time for those prior crimes.

Notably, the SJC did not dispute that the police report showed that Rudolph confessed to law enforcement to having engaged in criminal conduct in connection with the finger-shooting incident that potentially gave rise to serious new charges -- unlawful possession of a firearm and intentionally making a false report of a crime to the investigating officers, <u>see, e.g.,</u>

Commonwealth v. Fortuna, 951 N.E.2d 687, 693 (Mass. App. Ct. 2011) (affirming conviction of making false report of a crime for defendant who, after being hospitalized for a close-range and possibly self-inflicted gunshot wound, told responding officers that he had been shot from afar by an unknown assailant) -- and thus potentially to additional prison time beyond that which he already had been sentenced to serve. Nor did the SJC hold that the police report provided merely cumulative impeachment evidence insofar as it supported the reasonable inference that Rudolph was motivated to testify against Watkins out of a concern that he otherwise might face such serious new charges due to the confession that he had made to law enforcement in relation to the finger shooting. Instead, the SJC held only that the police report provided no support for such an inference, because nothing in the police report indicated that the law enforcement officers to whom Rudolph confessed to having shot himself even knew that Rudolph (to use the police report's phrasing) "became a witness" against Watkins.

But, of course, the SJC's factual determination about what the law enforcement authorities to whom Rudolph confessed knew about Rudolph's relation to the case against Watkins was plainly wrong. And, thus, the SJC, in finding the police report to be merely cumulative of the evidence that Watkins already had at the time of trial, did so only based on a misapprehension about

- 53 -

what that report shows. Moreover, it is clear to me that, once this misapprehension is corrected, the police report could support a reasonable inference that Rudolph was testifying against Watkins in part to stave off additional prison time that his formal deal did not encompass, given that the police report shows that Rudolph knew that he had confessed to additional crimes to law enforcement authorities who he knew were aware that he had become a witness against Watkins. For, in the face of evidence showing as much, it would certainly be reasonable for a juror to infer that Rudolph was of the view that his decision to go forward with his testimony against Watkins would help him avoid being charged for those new crimes.

Second, the police report is material to Watkins's effort to impeach Rudolph by revealing an instance in which Rudolph made false accusations that implicated Watkins (as they implied that Watkins's associates had gone after Rudolph violently because Rudolph was a potential witness against Watkins) to deflect the police's attention from Rudolph's own, possibly criminal, conduct -- namely, unlawfully possessing a firearm during the finger-shooting incident. The police report further reveals that, when pressed, Rudolph conceded that those accusations were false. The police report thus raises the following new question that no other evidence that Watkins had before trial did: if Rudolph was willing to protect himself by lying once about who committed a shooting by

implicating Watkins in that offense, wouldn't he be willing to do it again? And, the police report also raises one additional new question that is closely related: wouldn't Rudolph be especially willing to do just that if doing so would spare him from being subjected to a new felony conviction and yet more time in prison than he already knew that he might have to serve for the crimes for which he already had been convicted?

Perhaps aware of these difficulties with deeming the police report to be merely "cumulative" of the impeachment evidence that Watkins did have access to before trial, the majority does also assert that his Brady challenge to the report's non-disclosure fails for an independent reason. Here, the majority contends that, even if the police report were not merely cumulative of the other evidence that Watkins had in hand prior to trial, "competent defense counsel would not have chosen to introduce the finger-shot report to the jury" due to that report's potential to prejudice Watkins's own case by "opening the door" to the uncorroborated allegations that Rudolph had made about Watkins's associates having threatened him for agreeing to testify against Watkins. Maj. Op. at 30, 32.

This contention, however, is not one that the SJC itself advanced, the District Court relied on, or the Commonwealth thought sufficiently strong to be worth pressing to us in this appeal.

And, it is easy to see why those closest to the case have not thought much of this ground for denying Watkins's Brady claim.

The police report does state that Rudolph maintained to the police that he had been receiving threats, and the record does also show that Rudolph, in his deposition testimony, had referenced threats having been made against him by someone connected to Watkins. So, it is true that the use of the police report did present some risks. But, at the same time, the police report reveals an instance in which Rudolph sought to protect himself by lying about the nature and extent of threats connected to Watkins by inventing a story about a gun-wielding attacker to explain his gunshot wound. Thus, the majority arguably has it backwards in reasoning that, because Watkins's trial counsel acted competently in deciding not to use the evidence of Rudolph's prior recantation for fear that using it would open the door to Rudolph's allegations of threats by Watkins's associates, "competent defense counsel would not have chosen to introduce the finger-shot report to the jury." Maj. Op. at 32. And that is because the police report provides a hitherto unavailable means by which the prejudicial impact of introducing Rudolph's prior recantation could be mitigated, given that the police report contains evidence that tends to undermine the credibility of Rudolph's allegations about the threatening behavior of Watkins's associates in a way that no other evidence in the record does.

In making this observation, I am not suggesting that we may weigh the potential for the police report to bring Rudolph's private, pre-trial recantation back into play in assessing the prejudicial impact of the police report's non-disclosure. I am suggesting that the very fact that the police report might have that effect illustrates the problem with speculating that because Watkins's counsel made the permissible strategic choice not to use the evidence of the prior recantation, a reasonably effective defense counsel necessarily would not use the withheld police report. After all, the question that we are trying to answer is whether Watkins can show that "disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable." Kyles, 514 U.S. at 441 (emphases added). And, although the majority purports to "take an objective view of what competent counsel would do" in reaching the apparent conclusion that no competent counsel would have introduced the withheld police report, Maj. Op. at 30 n.15, the fact that Watkins's counsel was deemed competent in choosing not to introduce entirely different evidence hardly shows, objectively, any such thing. See Strickland v. Washington, 466 U.S. 668, 689 (1984) ("There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."). Thus, while it is true that no direct evidence definitively establishes that

Watkins's trial counsel would have used the police report, what matters is that -- as I have explained -- there is good reason to think that a competent defense counsel would have done so.[20]

## IV.

In sum, after reviewing Watkins's Brady challenge de novo, I am convinced that the fact that the police report was withheld does undermine confidence in the guilty verdict that the jury rendered.[21] Rudolph's testimony identifying Watkins as the shooter was the key evidence for the state at trial and that testimony was hardly rock solid. Thus, it does not stretch the imagination to think that the police report would have been the straw that would have broken the camel's back, when that withheld evidence would have enabled Watkins to develop a plausible and

---

[20] To the extent that the majority is suggesting that to show prejudice Watkins was required to introduce expert testimony showing that competent counsel would have used the withheld police report at his trial, it offers no authority to support such a requirement, nor does the state itself advance any such argument. Maj. Op. at 25–26.

[21] Although my analysis has focused on the prejudicial impact of the prosecution's withholding of the police report, I note that this conclusion is only reinforced by the evidence contained in the transcript of Rudolph's dangerousness hearing -- also the subject of a Brady claim by Watkins. That transcript shows that at that hearing, Rudolph had, in his telling, unsuccessfully "s[ought] not to be held" without bail by claiming that "the only reason why" he had a firearm was that he was "involved in a murder case" and was "being threatened" as a result. Upon being denied bail, Rudolph remarked to the judge, "[s]o, now what happens when the murder case comes up? Am I to come to court bright eyed and bushy tailed and testify against somebody else after this? That's not fair, your Honor. It's not fair."

coherent account of why Rudolph was not to be believed that Watkins otherwise could not make.[22]

That is not to say that we may lightly find that a failure to disclose evidence in a timely manner is prejudicial for Brady purposes. It is to say that we must not construe Brady's prejudice prong so strictly that it becomes, in effect, an automatic means of excusing concerning law enforcement practices that remain too frequent. See, e.g., United States v. Nejad, 487 F. Supp. 3d 206, 213-14, 225-26 (S.D.N.Y. 2020).

We recently recognized the need to be attentive in applying Brady's prejudice prong to the ways that impeachment evidence can shift a jury's thinking in a case that heavily depends on the testimony of a cooperating witness. See Flores-Rivera v. United States (Flores II), 16 F.4th 963, 965, 967-69 (1st Cir. 2021); Flores I, 787 F.3d at 18.[23] If we are just as attentive to

_____

[22] I note that the state makes no contention that the other evidence on the record against Watkins was in and of itself so overwhelming that he cannot show the requisite prejudice for that reason alone. See Smith v. Cain, 565 U.S. 73, 76 (2012) ("[E]vidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict."); Wood v. Bartholomew, 516 U.S. 1, 8 (1995); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (observing that arguments not developed on appeal are deemed waived).

[23] The majority suggests that Flores II and Watkins's case are worlds apart due to the evidence in the record here that corroborated a key witness's account against Watkins. Maj. Op. at 33-35. But, even though the record in Flores II contained video evidence that could have inculpated the defendant there, we still found that the defendant had shown the requisite prejudice from being denied access to evidence she was entitled to see because of

the possible power of impeachment evidence to undermine confidence in a verdict here, then I am convinced that -- given that in this case, too, a single cooperating witness's testimony looms large -- we must conclude that Watkins has proved the prejudice that Brady requires.  For that reason, I am convinced that "law and justice" require that we grant his federal habeas petition. Shinn v. Martinez Ramirez, No. 20-1009, 2022 U.S. LEXIS 2557, at *18 (U.S. May 23, 2022) (quoting Brown, 142 S. Ct. at 1524).

I therefore respectfully dissent.

how much the case hinged on the testimony of cooperating witnesses. 16 F.4th at 968-69.